[No. 30333. Department Two. March 26, 1948.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH A. WHETSTONE, *Appellant*.[1]

[1] Reported in 191 P. (2d) 818.

Monheimer, Schermer & Mifflin, for appellant.

Lloyd Shorett and Max R. Nicolai, for respondent.

JEFFERS, J.—The defendant, Joseph A. Whetstone, was indicted by a grand jury of King county, Washington, for the crime of "asking or receiving bribe," committed as follows, to wit:

"He, the said Joseph A. Whetstone, in the County of King, State of Washington, within ten years last past, and on or about November 26th, 1945, the exact date being unknown, unlawfully, while he, the said Joseph A. Whetstone was a duly elected executive officer, namely, County Commissioner for the County of King, and as such executing the functions of a public officer, did ask for and did receive from Orville E. Gibson, the latter acting as agent for Irene H. Jones, a compensation or reward, to-wit: One Hundred Dollars, ($100.00) in lawful money of the United States of America, upon an agreement or understanding that he, the said Joseph A. Whetstone, would use his official influence to facilitate the rezoning of certain lands in which Irene H. Jones was interested for use as an airfield;

"Contrary to the statute in such case made and provided, and against the peace and dignity of the State of Washington."

Count No. 2:

"He, the said Joseph A. Whetstone, in the County of King, State of Washington, within ten years last past, and on or about the 16th day of October, 1946, the exact date being unknown, unlawfully, while he, the said Joseph A. Whetstone was a duly elected executive officer, namely, County Commissioner for the County of King, and as such, executing the functions of a public officer, did ask for and did receive from Robert C. Gourlay, the latter acting as agent for J. Arthur Lind, a compensation or reward, to-wit:

Seven Hundred and Fifty Dollars ($750.00), in lawful money of the United States of America, upon an agreement or understanding that he, the said Joseph A. Whetstone would use his official influence to reduce an indemnity bond required from J. Arthur Lind by King County, and would permit the said J. Arthur Lind to reduce labor and material costs in connection with allowing the said J. Arthur Lind to use a King County bridge across the Snoqualmie River for the transportation of timber;

"Contrary to the statute in such case made and provided, and against the peace and dignity of the State of Washington."

The above indictment was filed in the superior court for King county on February 27, 1947.

On February 28, 1947, defendant interposed a demurrer to counts I and II of the indictment, on the ground that the indictment did not state facts sufficient to charge an offense under the laws of the state of Washington. On the same date, defendant also filed a motion for bill of particulars, or in the alternative to make more definite and certain. The demurrer and motion came on for hearing before the court on March 21, 1947, and after argument of counsel an order was entered overruling the demurrer and denying defendant's motion.

Defendant entered a plea of not guilty to each count contained in the indictment.

The cause came on for hearing before the court and jury on June 2, 1947. Evidence was introduced by both the state and defendant, and thereafter, on June 6, 1947, the jury returned a verdict of guilty of the crime of asking or receiving a bribe, as charged in count I of the indictment, and another verdict of guilty of the crime of asking or receiving bribe, as charged in count II of the indictment.

On June 9, 1947, defendant filed a motion for arrest of judgment, on the following grounds:

"(1) That the facts, as stated in the indictment, do not constitute a crime or misdemeanor.

"(2) That there has been no proof of some element of the crime for which the defendant has been tried in this cause."

On the same date, defendant also filed a motion for new trial, on all the grounds set out in Rem. Rev. Stat., § 2181. The motion for new trial and the motion in arrest of judgment were denied, and on July 15, 1947, judgment and sentence, based on the verdicts returned by the jury, were imposed. Counsel for defendant gave oral notice of appeal in open court.

Present counsel for appellant did not participate in the trial in the lower court.

Appellant makes the following assignments of error:

"(1) The overruling of defendant's demurrer interposed to both counts of the indictment.

"(2) The insufficiency of the allegations contained in each count of the indictment to constitute a criminal offense in each count.

"(3) The denial of defendant's motion in arrest of judgment.

"(4) The insufficiency of the evidence to support each count of the indictment.

"(5) The denial of defendant's motions for dismissal interposed at the conclusion of the state's case and at the conclusion of all of the evidence for a directed verdict.

"(6) Errors of law occurring at the time of trial denying defendant a fair trial.

"(7) Misconduct of the trial court and counsel in denying defendant a fair trial.

"(8) Misconduct of members of the jury which resulted in a denial of a fair trial to defendant."

Assignments of error Nos. 1, 2, and 3, are urged together, and appellant states in his brief:

"It is our position that both counts of the indictment are faulty and fail signally to allege a crime, specifically, the crime with which this defendant is charged, that of asking and receiving a bribe."

It is specifically contended by appellant that each count of the indictment is fatally defective, in that it fails to allege that the matter was one which was "then pending, or which may by law be brought before him [Whetstone] in his official capacity," as provided by Rem. Rev. Stat., § 2321 [P.P.C. § 118-59].

Respondent contends (1) that the indictment is sufficient because as to each count, instead of using the statutory language, it expressly states the specific matter concerning which the agreement was had; and (2) that if there was any defect in the indictment, such defect was cured by the fact that the elements allegedly omitted were introduced in evidence without objection, thereby amending the indictment.

The crime of which appellant was convicted is defined by Rem. Rev. Stat., § 2321, which, so far as material here, provides:

"Every executive or administrative officer or person elected or appointed to an executive or administrative office who shall ask or receive, directly or indirectly, any compensation, gratuity or reward, or any promise thereof, upon an agreement or understanding that his vote, opinion or action upon any matter then pending, or which may by law be brought before him in his official capacity, shall be influenced thereby . . ."

Relative to respondent's first contention, the particular part of count I referred to therein states:

". . . upon an agreement or understanding that he, the said Joseph A. Whetstone, would use his official influence to facilitate the rezoning of certain lands in which Irene H. Jones was interested for use as an airfield."

The particular part of count II referred to states:

". . . upon an agreement or understanding that he, the said Joseph A. Whetstone would use his official influence to reduce an indemnity bond required from J. Arthur Lind by King County, and would permit the said J. Arthur Lind to reduce labor and material costs in connection with allowing the said J. Arthur Lind to use a King County bridge across the Snoqualmie River for the transportation of timber."

Again stating respondent's position on this matter, it is that, by alleging the specific subject matter of the agreement, the indictment fully complies with Rem. Rev. Stat., § 2055 [P.P.C. § 132-5], which provides:

"Contents of indictment or information. The indictment or information must contain,—

"(1) The title of the action, specifying the name of the court to which the indictment or information is presented, and the names of the parties;

"(2) A statement of the acts constituting the offense, in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

It will be observed that the question here presented is whether or not the indictment sufficiently states "the acts constituting the offense [of asking or receiving bribe] in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended."

Appellant argues that it must be alleged in an indictment based on § 2321, *supra,* that the matter was "then pending, or [a matter] which may by law be brought before him [the official] in his official capacity." Neither count of the indictment contains the specific allegations last above quoted.

Appellant, in his opening brief, relies entirely upon the case of *State v. Hart,* 136 Wash. 278, 239 Pac. 834, to sustain his contention. The information in that case was based upon Rem. Comp. Stat., § 2321, now Rem. Rev. Stat., § 2321. The information did not allege

". . . that the matter of fixing the fees of these officers was then pending before him [the governor], or that it might by law be brought before him, or that there was any agreement or understanding that his vote, opinion or action in the matter should be influenced by the promise of such payment."

We quote from the opinion in the *Hart* case, and this quotation, it seems to us, will sufficiently show that the cited case is not controlling here.

"While it is alleged that the defendant asked the liquidator of the insolvent bank named and the attorneys of the liquidator to add a certain sum of money to their fees as such liquidator and attorneys, and pay the money over to him, it is not alleged that the matter of fixing the fees of these officers was then pending before him, or that it might by law be brought before him, or that there was any *agreement or understanding* that his vote, opinion or action in the matter should be influenced by the promise of such payment. . . .

"Statutes of this sort are common to most of the states of the Union, and, in so far as we are advised, the rule is

general that *there must be a duty required to be performed in relation to the matter charged by the officer or person who solicits the bribe before he can be brought within the purview of the statute.* It is perhaps unnecessary to add that in this state the governor has nothing to do with fixing the fees of a liquidator or the attorneys of a liquidator of an insolvent bank. This duty is imposed upon an officer known as the supervisor of banking, subject to the approval of the court in which the insolvency proceedings are pending. Rem. Comp. Stat., § 2271. The governor has no more concern therewith than has any other officer of the state." (Italics ours.)

It is apparent, we think, that the court, in arriving at its conclusion in the cited case, took judicial notice of our statutes, particularly those relating to the duties of the governor and the supervisor of banking. In other words, there were no allegations in the information in the *Hart* case which in themselves, or when considered in connection with the statutes of which the court took judicial notice, showed that the matter upon which the charge was based was one then pending before the governor, or which might by law be brought before him in his official capacity.

In the instant case, it is alleged in count I that appellant received one hundred dollars from Orville E. Gibson, acting as the agent of Irene H. Jones, upon an agreement or understanding that he, Joseph A. Whetstone, would use his official influence to facilitate the rezoning of certain lands in which Irene H. Jones was interested, for use as an airfield.

Under Rem. Rev. Stat. (Sup.), §§ 9322-1 [P.P.C. §§ 776-1] *et seq.,* the matter of rezoning property requires the approval of the board of county commissioners to make such rezoning effective.

In the instant case, it is alleged in count II that appellant received from Robert C. Gourlay, acting as the agent of J. Arthur Lind, $750, upon an agreement or understanding that he, Joseph A. Whetstone, would use his official influence to reduce an indemnity bond required from J. Arthur Lind by King county, and would permit Mr. Lind to reduce labor and material costs in connection with allow-

ing him to use a King county bridge across the Snoqualmie river, for the transportation of timber.

Under Rem. Supp. 1943, §§ 6450-2 and 6450-4 [P.P.C. §§ 603-1,-5], it is apparent that the power to establish, lay out, construct, alter, repair, improve, and maintain county roads is in the county commissioners of the several counties.

While the indictment in the case of *State v. Nick*, 66 Wash. 134, 119 Pac. 15, was based upon Rem. & Bal. Code, § 2320, now Rem. Rev. Stat., § 2320 [P.P.C. § 118-57], we are of the opinion that the rule announced therein relative to facts of which the court may take judicial notice in considering whether the allegations of an indictment are sufficient to state a crime, is applicable to the instant case. In the cited case, A. B. Nick was indicted by the grand jury of King county for the crime of bribing a *public officer*. On being arraigned, the defendant demurred to the indictment on the ground that it did not state facts sufficient to constitute a crime. The demurrer was overruled, whereupon he entered a plea of not guilty, and was tried, convicted, and sentenced for the crime charged in the indictment. Defendant appealed from the judgment of conviction. We quote from the opinion:

"The appellant first contends that a police officer as such is not a public officer, and does not ordinarily perform the functions of a public officer; that his powers and duties are not defined by statute, but are wholly the creation of municipal ordinances, *which the court cannot know judicially*; hence, it is argued that this information [indictment] is fatally defective in that it does not set forth the powers and duties of the police officer alleged to have been bribed, so that the court may know that he was such a public officer as the statute made it a crime to bribe. The information [indictment], it will be observed, does set out the specific acts which the officer was bribed to refrain from doing, and it is clear that this act was one that involved the powers and functions of a public officer. True, it is not alleged in direct terms that the officer had the power and authority to do what he is charged to have refrained from doing, but it is inferentially so alleged, and this is sufficient against a general demurrer. But while this would seem sufficient to meet the objection raised, we think the indictment sufficient for another reason. The courts can know judicially the

contents of the charter of the city of Seattle; hence, they can know that there is a police department in the city of Seattle composed of police officers who exercise the powers and functions of public officers; that is to say, they have power to make arrests for public offenses already committed, to make arrests to prevent the commission of public offenses, and to maintain the peace and quiet of the city. These are clearly the functions of public officers." (Italics ours.)

 It is the general rule that the constitution and public statutes of a state will be judicially noticed by all courts of the state. 22 C. J. S. 860, § 551. Rem. Rev. Stat., § 2067 [P.P.C. § 132-33], provides:

"Neither presumptions of law nor matters of which judicial notice is taken need be stated in an indictment or information."

It seems to us that the allegations in both counts I and II of the indictment here in question, when considered in connection with the statutes of the state, of which this court may take judicial notice, clearly show that the acts which it is alleged were the subject of the agreement or understanding were matters which by law might come before appellant in his official capacity.

In addition to Rem. Rev. Stat., § 2055, hereinbefore referred to, we have other statutes which have a bearing on the allegations of an information or indictment. Thus, Rem. Rev. Stat., § 2064 [P.P.C. § 132-27], provides:

"Words used in a statute to define a crime need not be strictly pursued in the indictment or information, but other words, conveying the same meaning, may be used."

Rem. Rev. Stat., § 2065 [P.P.C. § 132-29], provides:

"The indictment or information is sufficient if it can be understood therefrom,— . . .

"(6) That the act or omission charged as the crime is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended;

"(7) [That] the act or omission charged as the crime is stated with such a degree of certainty as to enable the court

312

to pronounce judgment upon a conviction, according to the right of the case."

■ When the statutes of this state are considered, and the rule announced in the case of *State v. Nick, supra,* is applied, in considering the sufficiency of the allegations of the indictment in the instant case to state a crime, we are of the opinion the allegations of both counts I and II were sufficient to charge the crime defined by Rem. Rev. Stat., § 2321, and that the trial court therefore properly overruled the demurrer to the indictment, and denied the motion in arrest of judgment, in so far as the latter motion involved the sufficiency of the indictment to state a crime.

Respondent further contends that the indictment could be considered amended to conform to the proof. We do not find it necessary to pass upon this contention, in view of the conclusion reached as hereinbefore set out. However, in passing, may we say that we have grave doubts in regard to this contention. While we appreciate that the words "indictment" and "information" are used interchangeably in our statutes, and while we also appreciate that Rem. Rev. Stat., § 2303, subd. 23 [P.P.C. § 112-93], states:

"The words 'indicted' and 'indictment' shall include 'informed against' and 'information;' and the words 'informed against' and 'information' shall include the words 'indicted' and 'indictment,' "

when the source of an indictment is considered, that is, the body (grand jury) which returns it, we are not at all certain that all the rules and statutes applicable to an information should be applied to an indictment, particularly Rule of Practice 12, 18 Wn. (2d) 40-a, which pertains to when and under what circumstances an information may be amended.

Appellant next argues assignments of error Nos. 4 and 5. This requires a discussion of the evidence, and we shall first take up count No. 1 of the indictment. The jury was entitled to consider the following testimony introduced by the state in support of count I.

For some years prior to 1945, Irene Havercamp, the mother of Irene Havercamp Jones, had owned about two hundred acres of land on the east shore of Lake Washington. This property was in the road district over which appellant had supervision. Mrs. Jones and her mother had endeavored to have this property rezoned for airfield purposes, their first application being in October, 1945.

Mrs. Jones was employed as bookkeeper by Orville E. Gibson, owner of the Lakeside Gravel Company, from August, 1944, until the latter part of January, 1947. Mr. Gibson's plant was located on the main highway to Issaquah, about one and one-half miles east of the East Channel bridge. This plant was also in appellant's road district. Mrs. Jones did not know appellant in 1945, but she knew that Mr. Gibson had sold gravel to the county, and that he knew appellant.

Apparently, in October, 1945, Mrs. Jones and her mother attended a meeting of the planning commission, relative to a rezoning of this property. Mrs. Jones was asked:

"Q. What was the action there at that meeting? A. The zoning was postponed or just set aside. That is all I know."

She also testified:

"Q. Did you ever discuss with Mr. Gibson the question of an airport? A. Yes, a lot of times. Q. Tell us whether or not you — tell whether you and Mr. Gibson came to any conclusion as to what should be done to effect a rezoning? A. After a number of conversations that we had together on an airport there was a sort of an idea was brought about that for possibly $500.00 Mr. Whetstone would zone it for us. Q. Did anybody go to see Mr. Whetstone? A. Mr. Gibson said he would see him.

"MR. GRIFFIN: I object to that and ask that it be stricken as hearsay.

"THE COURT: That raises the question of agency. What have you to say about that?

"MR. SHORETT: No objection to its being stricken.

"THE COURT: The jury will disregard that. . . .

"Q. What did you do with reference to the payment of any money? A. I gave Mr. Gibson $100.00. Q. About when was that? A. That was the first part of November, 1945. Q. Where did you give him that $100.00? A. At the

office. . . . Q. What did Mr. Gibson do with it, if you know? A. Mr. Gibson delivered it to Mr. Whetstone. Q. That is what Mr. Gibson said? A. That is what it went to Gibson for. Q. That was the same date you gave him the money? A. Yes, sir."

Mr. Gibson stated that Mrs. Jones talked to him several times in 1945 and 1946 about rezoning her mother's property; that he had known Mr. Whetstone for several years and had done business with him as county commissioner, in sales to the county of gravel and firebrick. His testimony continues:

"Q. Did Mrs. Jones at any time give you any money to be given to anybody else? A. Yes, she did. Q. When was that? A. I don't just remember what month it was. Q. Approximately when? A. It was the latter part of 1945, I believe. Q. How much money did she give you? A. $100.00. . . . Q. What was the purpose in giving that money? A. It was to be given to Mr. Whetstone."

Mr. Gibson then stated that he called Mr. Whetstone and made an appointment to have lunch with him; that thereafter he went to Seattle and met Mr. Whetstone at his office and they went out to lunch.

"Q. Did you have any talk with him at that time about an airfield? A. During the lunch time? Q. Yes. A. No. Q. Did you have any talk with him after lunch about an airfield? A. Yes, sir. Q. Where was your talk about an airfield? A. Between the cafe and his office. Q. What airfield were you talking about? A. The Havercamp airfield. . . . Q. You had a discussion with him about this property, the airfield property, did you? A. Yes. We talked about that. Q. Did the matter of zoning come up in that talk? A. I think that it did, yes. Q. State what you said to Mr. Whetstone about zoning? A. I can't just recall what I said to him. Q. State the substance of it. A. There was something said about rezoning, but I can't just recall what was said about it. . . . Q. Did you have any talk with Whetstone about $100.00? A. Yes. Q. Will you tell us what that was? A. I said I had $100.00 for him in this Havercamp matter. The money, it was to be given over to him. Q. Was there any conversation about who had given you the money? A. Yes, I explained that. Q. What did you say to him about it? A. I said it was sent over by the Havercamps. Q. How much did you say that you had?

A. $100.00. . . . Q. What happened to the $100.00? A. He said he couldn't promise anything. Q. What did you do with the $100.00? A. I gave him the $100.00. Q. Where were you when you gave him the $100.00? A. On the street. Q. State whether or not at that time you mentioned the reason for giving him the $100.00? A. I told him that it was sent over by the Havercamps. Q. Did you explain in connection with what matter? [Objection by Mr. Griffin that the question had been answered. Overruled.] Q. Did you explain in connection with what matter the $100.00 was being paid? A. I just imagine I mentioned —

"MR. GRIFFIN: I object to any imagination. It is a conclusion of the witness.

"THE COURT: What you think or imagine—what do you recall, or do you recall?

"Q. What do you recall from your own memory? A. We were talking about rezoning that property, our talk was about that. Q. You were talking about rezoning what? A. The airfield. Q. What airfield? A. The Havercamp airfield. Q. State whether or not Mr. Whetstone took this $100.00? A. Yes, he did. . . . Q. Did you explain whose money that was? A. I had already told him that, yes. Q. What, if anything, did Mr. Whetstone tell you he would do about that rezoning? A. He said he couldn't promise anything."

Sometime after the meeting last above referred to, a grand jury was called in King county, and Mr. Gibson was subpoenaed to appear before that body, and did appear as a witness. The second day Mr. Gibson testified before the grand jury, Mr. Whetstone came to see him about noon.

"Q. What did Mr. Whetstone say? A. He said he wanted to talk to me about the grand jury. Q. What did you say? A. I told him that I couldn't talk. Q. Did you tell him why you couldn't talk? A. That is right. . . . Q. And did he propose that you meet some place to talk? A. Yes. Q. What was his proposal? A. I don't remember. We talked about that we should go to the bridge and meet later that night. Q. What bridge do you mean? A. On the west end of the Lake Washington bridge. . . . Q. Who proposed that you meet there? A. I don't recall whether it was me or him. . . . Q. Did you want to meet Mr. Whetstone? A. No, sir. Q. Was it your idea to have a meeting? A. No. He came to me."

Mr. Gibson stated that after his talk with Mr. Whetstone he went to see Tracy Griffin, who called Mr. Shorett, and as a result arrangements were made to have Captain Mahoney accompany him that night to the meeting with Mr. Whetstone. Mr. Gibson further testified that he met Captain Mahoney that evening at his plant; that they then drove over to meet Mr. Whetstone, Mahoney concealing himself in the back of the car; that they arrived at the meeting place about eight o'clock; that Mr. Whetstone got out of his car and entered the Gibson car.

"Q. Now, will you state this, did Mr. Whetstone make any statement or not in your car regarding the sum of $100.00. A. It seems to me there was some talk about it. I can't recall what he said. . . . Q. Do you remember something about a promise of $400.00, about Mr. Whetstone saying about a promise of $400.00? A. The thing was mentioned about more than $100.00, yes. Q. What did Mr. Whetstone say, if anything, about an additional sum? A. After reading that [notes Gibson dictated after this meeting] I suppose I could have,—but I can't recall it that way. Q. After you read that do you remember? A. He mentioned something about $100.00 and more money, I don't know if it was four or five hundred dollars."

Mr. Gibson stated that Mr. Whetstone wanted to know what he testified to before the grand jury, and that he told Whetstone he could not talk about it.

"Q. Not what you said, what did he say? A. He said something about to the effect they no doubt asked about the airfield, that that was the only reason why I would be there, or something like that, and he kept asking me what I testified to. . . . Q. What did he say was the reason he wanted to know your testimony? A. He mentioned he was going before the grand jury. . . . Q. Did Mr. Whetstone tell you at that time that you were in that car that if you would tell him or give him some hint about what you talked to the grand jury about in the jury room that Mr. Whetstone could arrange his story accordingly and all of you would be protected? A. There was something like that, but that doesn't sound like he told it. Q. How is that? A. He wanted me to tell what I testified to so that he could go and testify, and I told him I didn't have a right to tell what happened before the grand jury, what I testified on that. . . . Q. Didn't he tell you that he would go before

the grand jury—didn't he tell you this that he would go before the grand jury and testify that you had come to him, Whetstone, and offered him $500.00 to vote for that airport? A. He said that I had offered him $500.00."

R. F. Mahoney was captain of police in the Seattle police department. During the session of the grand jury, he had been assigned to the duty of investigating matters which were brought to its attention. Mr. Mahoney had sixteen years experience in investigating crime. He stated that he had been called by Mr. Shorett and instructed that he was to conceal himself in Mr. Gibson's car, during a meeting that night between Gibson and Whetstone. Mr. Mahoney was driven to Mr. Gibson's office by Mr. Ekern, an investigator for the prosecutor. It will be recalled that Mr. Gibson's office is on the east side of the Lake Washington bridge. Mr. Mahoney got in the back of the Gibson car just before they came to the bridge; the car crossed the bridge and came to a stop; they waited a while "and someone came to the car door and Gibson said 'Hello, Joe', and Mr. Whetstone answered 'Hello, Gib.'"

"Q. Did you recognize this other man, recognize the man's voice? A. Yes. Q. Who was the man? A. Mr. Whetstone. . . . Q. Was there any conversation or any statement made by Mr. Whetstone regarding Mr. Gibson's testimony before the grand jury? A. There was. Q. State what that was. A. Mr. Whetstone requested Mr. Gibson to tell him what the grand jury had questioned him about and what his answers to the grand jury were. Q. What did Mr. Gibson say to that? A. Mr. Gibson said 'Joe, they have had me up there on two occasions and they are really hell on me and I said things that I can't tell you because they asked me not to tell them.' Q. What did he say? A. Mr. Whetstone said 'Hell, that is what they told me in there, that they are not to tell, and then they run right down to the prosecutor's office and tell Mahoney and Shorett what they said.' Q. Was there any other conversation upon this question of what Gibson told to the grand jury? A. Yes. Q. Go ahead. A. Mr. Whetstone repeated and asked Mr. Gibson to tell him what was said before the grand jury and Mr. Gibson very persistently refused on each occasion to tell. Q. Have you told us all that Mr. Whetstone said? A. I will tell you what he said. He said 'You went up there

and said that I had accepted a $500.00 deal on this airport.' And he said 'You said that was a bribe you gave me, $100.00.' He said 'By God, when you gave me $100.00 you didn't say what I was to do with it and I gave it to Russell Fluent' . . . Q. Did you hear any more conversation from Mr. Gibson there? A. Yes. Q. After Whetstone told him what he thought he had testified to he said 'Isn't that right?' Gibson said, 'Joe, I am sorry, I can't tell you.' "

It further appears from Mr. Mahoney's testimony that Whetstone stated: " 'If you were the least bit fair you would help me now. I helped you [Gibson] on this dock deal and you should help me now' "; and that Whetstone further stated " 'No one knows anything about this deal except you and I.' " Mr. Mahoney's testimony continues:

"Q. Was anything said during the course of the conversation there about the word 'bribery'? A. Yes, sir. Q. State what was said. A. Mr. Whetstone said during that conversation 'It won't be so very nice when I get up in front of that jury and tell them that you bribed a county official.' "

On cross-examination, the following questions, among others, were asked Mr. Mahoney:

"Q. I understood you to say that Mr. Whetstone said to you that night that $100.00 he got was given to Russell Fluent? A. That is right. Q. How did he state that? A. He said 'The money you gave me, $100.00, I never got any part of that money. That was used for a gift to Russell Fluent.' "

In its case in chief, the state also called Don S. Johnson, chairman of the King county planning commission. This witness identified state's exhibit No. 1.

"Q. Do you recognize state's exhibit 1 for identification? A. Yes, I do. That is a resolution sent from the planning commission to the board of county commissioners. MR. GRIFFIN: I did not hear that. Q. Repeat the answer. A. It is a resolution drawn up by the planning commission and sent with the knowledge of the officers of the planning commission for report and approval to the county commissioners. Q. What is this resolution to do with? A. I have to read it. Q. Do you know this resolution? Don't you know what it is? A. No. Q. I will show it to you (Hands

resolution to witness). A. Yes. This is the resolution of the planning commission recommending that the board of county commissioners approve the rezoning of the Havercamp property over there at Newport. Q. What is the time? A. The date is the 30th of December, 1946. Q. And that is signed by the county commissioners? A. Yes, sir. Q. And that accomplishes the rezoning, does it. A. Yes, sir."

Exhibit No. 1 was offered and admitted in evidence without objection.

The cross-examination of the witnesses hereinbefore referred to did not, in our opinion, materially change the testimony of the various witnesses.

We shall next consider the testimony offered by the state in support of count II.

J. Arthur Lind was called by the state. The material part of his testimony shows that he was the owner of a half interest in, and was manager of, the Preston Mill Company, located at Preston, Washington; that the company had acquired some timber on the north slope of Mount Si,. on the north fork of the Snoqualmie river, which they planned to log; that in order to get this timber out, it would be necessary for the company to use a county bridge across the north fork of the Snoqualmie river, this bridge being a wooden span structure having a load limit of seven tons; that the logging trucks, when loaded, would weigh as high as twenty-five tons, and as a consequence the company would not be able to use the bridge in its then condition. This bridge was in Mr. Whetstone's district.

Mr. Lind visited the county engineer's office to see about using the bridge, and was told that it would be impossible. It was suggested that possibly Lind might strengthen the bridge by reinforcing sections of it, and Lind estimated that to make the changes suggested by the engineer would cost $4,000 or $5,000. Lind thought the most feasible way was to reinforce the bridge, which he estimated could be done for $1,500 to $2,500. Lind went to Mr. Whetstone's office and asked him what could be done, and was told, "It is a matter for our engineer, the county engineer." Lind then wrote a letter to Mr. Whetstone, and was informed that the matter

320

had been referred to the county engineer, Mr. Mannes, who was an appointee of Mr. Whetstone. The engineer's office advised Lind that they would require a $100,000 bond. Later, Mr. Lind again visited the engineer's office and told Mr. Mannes that the bond was out of reason, saying " 'That bridge doesn't cost over $25,000 or $30,000 at the most and I don't think you should require us to furnish a bond for $100,000 to guarantee the repairs of a bridge of that class.' " They then talked about the possibility of reducing the bond, "and they said it might be arranged." Later, Lind was informed that he might use the bridge if he would reinforce it, agree to certain conditions, and furnish a $20,000 bond.

Mr. Lind went to the hospital in July, 1946, and while there decided to sell the timber, and did sell it. It was understood between Lind and the parties to whom he sold the timber that he would continue the negotiations relative to getting permission to use the county bridge.

Lind then contacted Robert Gourlay, who agreed to see Mr. Whetstone about this matter. Mr. Gourlay is president of the Gourlay Lumber Company, located at 12300 Fifteenth avenue northeast. He had known Mr. Whetstone for four or five years. This concern, which is a retail lumberyard, is located in Mr. Whetstone's district, and Gourlay had sold lumber to the county. Mr. Gourlay had known Mr. Lind for some time, and the Preston mill, operated by Mr. Lind, was the main source of supply for Gourlay Lumber Company's common lumber. Mr. Gourlay called Mr. Whetstone on the telephone and talked to him about this bridge, and whether there wasn't something which could be done about lowering the bond in connection with the use of the bridge over which Mr. Lind wanted to haul some logs.

"Q. What did Mr. Whetstone tell you? A. Well, in general he would see what he could do. Q. Did you ever talk to Mr. Whetstone about this matter again? A. Yes, several times. Q. How long was it after the first conversation? A. I couldn't say exactly, it must have been a week or two. Q. What was that conversation? A. On the same line. Q. Was there any mention of money of any kind in any of these conversations? A. Yes, sir. Q. Will you state when the mention of money was first? A. I believe the first or

second conversation. Q. Who brought up the subject of money? A. I did. Q. What did you say? A. Just exactly I can't remember, but that if we could get the bond lowered that Mr. Lind thought he would pay a certain amount of money. Q. Did you name an amount? A. Not exactly at that time. I had understood— MR. GRIFFIN: I object to what he understood. Q. Just tell us what was said, if you set any limit in the matter of suggestions. A. Well, I think I was at that time— MR. GRIFFIN: I object to what he thinks as his conclusion. THE COURT: What is your best recollection? A. Well, I can't remember exactly, although there was talk of money. . . .

"Q. Tell us what the conversation was as to Whetstone. If you don't remember whether the first or second or third time, tell us that. A. The approximate cost of getting these things done would be $1500.00. Q. What did Mr. Whetstone say about that? A. He said he thought that was about the least he could get it for. Q. Did Mr. Whetstone say anything as to whom that money would be paid to? A. Not at that time, no sir. Q. Did he suggest what the $1500.00 was to be for? A. In order to lower the bond on the bridge and to get permission to use the bridge, lower the bond. The bond was set at a $100,000 bond for the use of the bridge. To lower that maybe to $10,000 or $20,000 and to allow the use of the bridge without damage as to Mr. Lind. Q. Did you have any further conversation with Mr. Whetstone after that mention of $1500.00? A. Yes. . . . Q. Did Mr. Lind authorize you to suggest any particular figure?

"MR. GRIFFIN: I object to that as calling for hearsay, leading and suggestive, calling for incompetent and hearsay testimony.

"THE COURT: If you require the court to rule upon that I am prepared to rule as indicated the other day on the theory that it is a communicated word and that it is binding upon the theory of agency, that there was an agency created and that this agent was authorized to make a certain statement and did in fact make it. That became then a communicated fact.

"The jury will understand that this is a matter of agency and, if the agency is not in their judgment established, they will disregard this testimony. He may answer.

"A. He authorized me to offer $500.00. Q. Do you remember about when this was? A. The middle or latter part of the summer, I think. Q. Of what year? A. Last year. Q. Did you talk to Mr. Whetstone after you received that

322

authorization? A. Yes, sir. Q. Where did you talk to him? A. Over the 'phone. Q. And tell us the substance of your conversation? A. I told Mr. Whetstone that Lind thought that was all he could afford to pay and all that it was worth. Q. (The court) What was the sum? A. The $500.00.

"MR. GRIFFIN: We want our objection to go on all this and that will be so understood.

"THE COURT: Yes. It is so understood.

"A. Anyway the cost of the thing finally was compromised at $750.00. Mr. Lind—I said to Mr. Lind— MR. GRIFFIN: I object to that as— Q. You cannot tell what you and Mr. Lind talked about, just what Mr. Whetstone talked about. A. Oh. Q. What did Mr. Whetstone say when you offered him $500.00? A. He didn't—he said that he didn't think he could quite get it over for that. Q. Did he finally indicate what Mr. Lind should do after that? A. He indicated there were other people.

"MR. GRIFFIN: I object to that as calling for a conclusion of the witness.

"THE COURT: Let him state.

"Q. Did he say there was anybody else? A. Yes. Q. What did he say? A. He didn't mention any names in that conversation, but mentioned that other people were involved. He didn't think that $500 would do the job. Q. What reply did you make? A. I asked him would he consider making it $750.00. Q. What did Mr. Whetstone say? A. He said 'I think I can.' Q. Did you later tell Mr. Lind about that $750.00 proposition? A. Yes, sir. I told him the next morning. Q. Did you talk at his office? A. Yes, sir. Q. Later on did anybody give you any money? A. Yes, sir. Q. Who gave you any money? A. Mr. J. Arthur Lind. Q. Do you remember when that was? A. It was in October. Q. Of what year? A. 1946, last year."

May we at this point go back to the testimony of Mr. Lind. He testified that he turned over to Mr. Gourlay $750 in currency; that he put this money in an envelope, placed it on the table, and told Mr. Gourlay it was $750 for the commissioners. It further appears from Mr. Lind's testimony that he owed the commissioners nothing and had no deal of any kind with the county pending, except the bridge deal. This money was turned over to Gourlay in October, 1946.

State's exhibit No. 3 is a check for $650, issued by the Preston Mill Company to the order of J. Arthur Lind. Mr. Lind stated that the $750 he gave to Mr. Gourlay was made up of $650 received by cashing the above check, and $100 he had in his wallet.

Going now to Gourlay's testimony, this witness further stated that, four or five days after receiving the money from Lind, he called Mr. Whetstone on the telephone and asked him to drive out to his office; that Mr. Whetstone came out, and Gourlay handed him the envelope containing the money, with the following remark: " 'Here is a little present from Art Lind to you' "; that Whetstone put it in his pocket.

It may be noted here that state's exhibit No. 2 is a letter from C. O. Mannes, county road engineer, to the Preston Mill Company, dated June 13, 1946. We quote from this letter:

*"We do not favor the driving of false bents* under the present structure for the purpose of strengthening, as we feel this would endanger the structure during high water. If this is the only way out and this method is used, we must insist the county be protected by a surety bond to the extent of $100,000 in case the bridge is lost or damaged." (Italics ours.)

Notwithstanding the above letter, the bond was subsequently reduced to twenty thousand dollars, and contained, among others, the following provisions:

"WHEREAS, the above named principal has been authorized by the Board of County Commissioners of King County, Washington, to use Bridge No. 122-I, located in Section 34, Twp. 24, North, Range 8 E.W.M., for the purpose of carrying and transporting logs across Bridge No. 122-I in heavier loads than the posted limit of seven (7) tons across the bridge above mentioned,

"Now, THEREFORE, the conditions of this obligation are such that the principal shall strengthen the bridge and the approaches to the bridge *by building two or more false bents* and additional bracing as the County Road Engineer of King County, State of Washington, shall direct . . ." (Italics ours.)

At the close of Mr. Gourlay's testimony, the state rested, and appellant then challenged the legal sufficiency of the evidence on both counts, on the ground that the evidence introduced on behalf of the state was not sufficient to submit to the jury the matters and things alleged in counts I and II. After argument, the court denied appellant's motion.

Appellant then took the stand and testified at length. Relative to the first count in the indictment, he testified that he knew Mr. Gibson, hereinbefore referred to; that the county had bought and was still buying gravel from him; that he had met Mrs. Jones only once, when she came to his office and made certain threats as to what she would do if she did not get her property rezoned. He further testified that, when the rezoning of the Havercamp property and other proposed airfield sites first came before the commission, the resolution was killed on his motion; that he was in favor of using the Havercamp property as a state park; that a meeting was called for November 26, 1945, at which he presided, and which was attended by a large number of people who favored or were against the rezoning of this property for an airfield. As a result of this meeting, a committee of the planning commission was appointed to investigate and study the situation. The committee, of which Mr. Ehrlichman was chairman, recommended that the Havercamp property and other property be rezoned for airplane bases, and thereafter, on December 30, 1946, Mr. Whetstone and the other two commissioners approved the recommendation of the committee, and directed the planning commission to make the necessary zoning reclassifications.

Mr. Whetstone admitted having lunch with Mr. Gibson at about the time testified to by Gibson, but denied that anything was said during lunch about the Havercamp property, or on the way back to his office. He stated that after they got back to his office Mr. Gibson mentioned the zoning matter; that he told Gibson he was against the establishment of an airfield or seaplane base on Lake Sammamish or Lake Washington, and "that there was very small likelihood that the planning commission would approve the Havercamp field."

"Q. Was there any further conversation about the property then? A. Yes. At that time he told me that Miss Havercamp would spend $500.00 to have that property rezoned. Q. He said she would? A. Yes, he said she would. And I don't know just how he approached it but he indicated— yes, I do. He said if there was a cash deficit in my campaign that she would make a campaign contribution or campaign fund to the extent of $500.00. Q. What was your answer to that? A. My answer was no, I had no cash deficit, and that I wasn't at all interested, that the thing couldn't go through as far as I could see."

Mr. Whetstone denied that Gibson ever gave him one hundred dollars, or that he ever received that amount from Gibson, although he stated that while Gibson and he were in the restaurant, the former "took the one hundred dollars and said that he would like to contribute that to me to help pay those expenses and to apply upon—," to which he (Whetstone) replied that his campaign was all paid for and that he didn't accept any contributions of that kind.

Appellant admitted meeting Mr. Gibson at the latter's office on February 25 or 26, 1946. He stated that Gibson would not talk to him about the grand jury, but suggested that they meet somewhere that night. The plaza was finally decided upon, and a meeting was arranged for seven-thirty that evening. Appellant stated that he went to this meeting, and when the Gibson car drove up, he got in the car; that Gibson kept saying "I can't talk with you"; that nothing was said about money or about one hundred dollars; that Russell Fluent's name was not mentioned; that he was in the Gibson car about ten minutes; that nothing was said that night by Gibson or himself about the Havercamp airport; that he did not talk about any money paid to him, as testified to by Captain Mahoney.

In regard to the second count, appellant admitted he received a letter from Mr. Lind, whom he had known for some time, about the bridge matter. He stated that he did not answer the letter, and that about a week later Mr. Gibson came to see him; that appellant suggested that Lind see the engineer's office and work the matter out with them; that appellant did not see the engineer on behalf of Mr. Lind.

Appellant stated that he knew Robert Gourlay, and had done business with him for the county; that he received a call from Gourlay in October, 1946, to come to his office, and that he went to Gourlay's office that evening.

"Q. Did you have any conversation with him that night? A. Yes. Q. Relative to what? A. Relative to a campaign contribution from Mr. Lind."

Appellant stated that Gourlay then told him about a lumbermen's convention which he had attended.

"Q. And what else did he say? A. . . . . And then he said *at* Art Lind, who had gone to California, he had stopped into the yard and left this, he said, with him for me, and he handed me an envelope and he said 'It is money for the campaign.' Q. What else did he say? A. And I recall I said at that time 'Bob, I am not running for office. I am not up for election this year.' And he said, 'Well, Art said to use that in any campaign or on anyone that you want to or in any manner that you want to.'"

Appellant stated that the envelope was sealed, and that he did not know how much money was in it; that he took the envelope; that he was there about four or five minutes and then went home; that when he opened the envelope he found that there was $750 in it; that he took the money to his office the next day and locked it in his desk.

"Q. Then what happened after that? A. Then I put— gave the money to other campaigns, or two campaigns, rather."

Appellant testified that Gourlay had never called him and talked to him about five hundred dollars or seven hundred fifty dollars.

"Q. Did he ever mention a bond to you? A. Yes, he did. He called me and said he was interested, very much interested in the granting of the permission to the Preston Mill Company to use this bridge, because he said the object he would be most interested in the deal was the peeler logs, whatever that is, I don't know. . . . Q. What did you tell him at that time? A. I don't remember. I undoubtedly told him I would do whatever I could to get it done."

Subsequently the county commissioners approved the bond hereinbefore referred to.

Mr. Whetstone admitted that this was the first time he had ever received any money from Mr. Lind, so far as he could recall. He stated that eventually he gave one hundred fifty dollars of this money to H. C. Armstrong's campaign, three hundred dollars was sent to Carroll Carter, and the other three hundred dollars to Judge Edward Connelly's campaign.

It may be stated that Mr. Armstrong, who was an employee of Mr. Whetstone, stated that he received a campaign contribution of one hundred fifty dollars from Mr. Whetstone just before the election in 1946. Carroll Carter also testified that he received a campaign contribution of three hundred dollars from Mr. Whetstone in the fall of 1946. Judge Connelly and his campaign manager in Seattle, Mr. Holcomb, both testified that so far as they knew they had received no three hundred dollar contribution from Mr. Whetstone.

At the close of all the evidence, appellant moved for a directed verdict.

While of course the jury was entitled to consider so much of the testimony as it felt was entitled to be believed, and the verdicts returned show that the jury must have believed the testimony introduced by the state, we have set out the highlights of Mr. Whetstone's testimony in order that his position, as explained by him, might appear.

It is apparent, of course, that there is a conflict in the evidence, and the question to be determined is whether or not there is sufficient evidence to sustain the verdict returned by the jury on each count of the indictment.

Appellant's main contention is that the evidence entirely fails to show any agreement or understanding between Whetstone and Gibson, and between Whetstone and Lind, that Whetstone would use his official influence to do any of the things it is alleged he agreed to do.

It is evident that the judge who tried this case did not place too much weight on the exact words used by the parties concerned, for in denying appellant's challenge to the sufficiency of the evidence made at the close of the state's case, he stated:

328

"The phraseology adopted by the persons who seek to approach a public officer for the purpose of suborning him or in any way corrupting him is more or less immaterial.

"It is quite natural that men of the underworld or men who adopt the tactics will choose to disguise their purpose and plan in a phraseology of their own."

■ While we have set out what Mr. Whetstone stated he did with the seven hundred fifty dollars he received from Lind, that is not of importance herein, for we stated in *State v. London,* 194 Wash. 458, 78 P. (2d) 548, 115 A. L. R. 1255:

"The question was not what was done with the money after appellant secured it, but the reason and purpose of receiving it."

On the question of an "agreement or understanding," we desire to quote from the case of *State v. Morrison,* 175 Wash. 656, 27 P. (2d) 1065. In that case, the defendant (appellant) was, by an indictment, charged in two counts with the crime of asking and receiving a bribe. The principal error assigned was that the evidence was not sufficient to take the case to the jury. The opinion states:

"It is true that much of this evidence was in the form of testimony from the person who admitted that he paid the bribe money, but there was much of corroboration in the surrounding circumstances and in testimony given by others. Had the testimony of the bribe-giver been uncorroborated, still it would be sufficient to take the case to the jury. *State v. Wappenstein,* 67 Wash. 502, 121 Pac. 989. . . .

"But, returning to the question of the sufficiency of the evidence, it seems to be urged that, because the understanding was reached by the use of indirect terms, the jury was left to speculate upon the vital point. We do not think so. Such things are usually approached indirectly, and few are bold enough to use direct terms to indicate their intention or desire. Here, the subject of the assessment of the particular property was under consideration. The evidence clearly and expressly indicates that a special favor in the nature of a low assessment was requested; and thereupon appellant, in effect, answered, 'That will cost you some money,' and the reply was made, 'I expected that it would.' "

Bribery is defined in 11 C. J. S. 840, § 1, as follows:

"Bribery may be defined generally as the voluntary giving or offering to, or the acceptance by, any public officer or official, of any sum of money, present or thing of value, to influence such officer or official in the performance of any official duty required of him, or to incline him to act contrary to known rules of honesty and integrity. Bribery is an offense against public justice, the gist of the crime being the wrong done to the people by corruption in the public service."

See, also, *People v. Patillo*, 386 Ill. 566, 54 N. E. (2d) 548, 158 A. L. R. 316, and annotation for general discussion of bribery.

██ *"Personal participation of accused* in the act of bribery is not necessary, and it is sufficient that the act is accomplished through the agency of others." 11 C. J. S. 844, § 2.

In regard to the question of agency here involved, we desire to quote from *Bender v. Ragan*, 53 Wash. 521, 102 Pac. 427:

"Appellants argue, and cite some authorities to the effect, that agency cannot be proved by the declaration of the agent. That rule has no relevancy to this case, because here the agent himself testified directly as to his authority. He was competent to so testify, as much as the principal. This is not a case where the declarations of the agent are sought to be proved by third persons to show agency. The best evidence of that fact is the testimony of the agent or the principal."

See, also, *Singer v. Guy Inv. Co.*, 60 Wash. 674, 111 Pac. 886.

"It is ordinarily immaterial that the act sought to be influenced was within the control of an official group of which the officer in question is only a member." 11 C. J. S. 849, § 2.

"If the bribe is offered or received, it is not essential that the act for which it is given be actually accomplished; the offense is complete when the bribe is offered and accepted for the purpose of influencing official action." 11 C. J. S. 852, § 2, under heading " (5) Accomplishment of Act."

We have examined a good many cases where the words "agreement" or "understanding" used in bribery statutes

have been construed by the courts of various states, and the statement is made that the meaning to be given to those words depends upon the connection in which they are used, and that in construing a statute it is a very unsafe practice to adhere strictly to lexicographers' definitions of words standing alone and severed from their context.

In *People v. Brigham,* 72 Cal. App. (2d) 1, 163 P. (2d) 891, defendant was charged with a violation of § 68 of the California Penal Code. This section contains a provision to the effect that every executive officer who asks or receives any bribe

" . . . upon any agreement or understanding that his vote, opinion, or action upon any matter then pending, or which may be brought before him in his official capacity, shall be influenced thereby . . . ."

In the cited case, the court quoted from *People v. Kerns,* 9 Cal. App. (2d) 72, 48 P. (2d) 750, at p. 75:

" 'It is not necessary that there be an understanding, in the sense of an agreement, with the person unlawfully approached, but merely an understanding on the part of the bribe seeker himself that his official action shall be influenced.' "

The opinion in the *Brigham* case continues:

"The 'agreement or understanding' as used in section 68 is not to be confused with the same words when used in connection with the valid and uncontaminated agreements incident to honest and honorable transactions."

After a consideration of the record in the instant case, we are of the opinion that there was sufficient evidence introduced by the state in support of each count of the indictment to take the case to the jury, and that there was sufficient evidence introduced to sustain the verdict returned by the jury on each count. It follows, therefore, that the court properly denied appellant's challenge to the sufficiency of the evidence made at the close of the state's case, and appellant's motion for a directed verdict made at the conclusion of all the evidence.

In regard to assignments of error Nos. 6 and 7, appellant states in his brief:

"It is our contention that on numerous instances improper cross-examination was permitted by the trial court, the prosecutor was guilty of improper and prejudicial conduct, and that in some instances the trial court erroneously ruled upon questions of evidence. We contend that all of the foregoing, when considered together, gives a clear picture to this appellate court supporting our contention that the defendant was deprived of a fair trial. In addition thereto, certain instructions were given to the jury which on review we find were improper."

No exceptions were taken to any of the instructions given, and no instructions were proposed. The instructions as given became the law of the case, and no error can be predicated on the instructions.

We shall take up the questions raised by assignments Nos. 6 and 7 as they are discussed in appellant's brief. Before discussing them, however, we desire to state some general principles applicable to our consideration of such questions.

Under our decisions, misconduct of counsel constitutes "error of law," to which exception must be taken. *State v. Bauers,* 23 Wn. (2d) 462, 161 P. (2d) 139, and cases therein cited.

The ruling of the court being "an error of law occurring at the trial," an order granting a new trial cannot be predicated upon such ruling, in the absence of an exception to it. *State v. Bauers, supra.*

In passing upon a motion for new trial based upon the ground of alleged misconduct of counsel, the judgment of the trial court must be given great weight, and in ruling upon the motion, the trial court has a wide discretion. *State v. Van Luven,* 24 Wn. (2d) 241, 163 P. (2d) 600.

The matter of the scope of the cross-examination of a witness rests largely in the discretion of the trial court, and this court will not disturb the ruling of that court unless the discretion is abused. *State v. Linden,* 171 Wash. 92, 106, 17 P. (2d) 635.

It is first contended that the court erred in permitting the witness Irene Jones to testify to conversations between herself and the witness Gibson, not in the presence of appellant. Appellant refers to the statement of facts, p. 10, line 14,

to p. 11, line 13. No objection to Mrs. Jones' testimony was made until line 20 on p. 10. Mrs. Jones was asked:

"Q. Did anybody go to see Mr. Whetstone? A. Mr. Gibson said he would see him. MR. GRIFFIN: I object to that and ask that it be stricken as hearsay. THE COURT: That raises the question of agency. What have you to say about that? MR. SHORETT: No objection to its being stricken. THE COURT: The jury will disregard that."

The following question was then asked Mrs. Jones:

"Q. Did you have any understanding as to what amount was to be paid? MR. GRIFFIN: Objected to as calling for a conclusion and improper and incompetent as violating the hearsay rule. THE COURT: She may answer the question. Q. Read the question. (Question read.) A. Yes. The understanding was that—"

Mr. Griffin objected, and the question was not answered. Appellant further states in his brief:

"Following immediately thereafter, the witness was again permitted to testify to sheer hearsay, which was finally checked by an objection of defendant's counsel (St. 12, lines 2-23)."

No objection to the testimony on p. 12 of the statement of facts was made until on line 12.

"Q. Did you authorize Mr. Gibson to promise anything in addition to that $100.00? A. Yes, I did. Q. What was that? MR. GRIFFIN: I object to that as incompetent for any purpose and calling for hearsay testimony. THE COURT: That would be a conclusion. It may be that it would be part of a verbal act. MR. SHORETT: That matter will be cleared up after Mr. Gibson has testified. I withdraw that for the present. THE COURT: Very well."

There is certainly no merit to appellant's contention up to this point, even if we assume that Mrs. Jones could not testify to what she authorized her agent, Mr. Gibson, to do. ▮ It is true that on p. 14 of the statement of facts Mrs. Jones was asked:

"Q. Did you ever pay the other $400.00? A. No, sir, I did not. [Mr. Griffin objected and moved that the answer be stricken.] Q. I will rephrase the question. Did you ever pay Mr. Gibson the $400.00? [Objection by Mr. Griffin.] THE

Court: She may answer that. A. No, I did not. . . . Mr. Griffin: My objection goes to the question as not being connected up with the matter of agency."

If there was error in permitting the witness to answer the last question, which in our opinion there was not, we would still be unable to see where appellant was prejudiced by the answer.

■ It is next contended that during the examination of Mr. Gibson there was a comment by the court on the conduct of counsel for appellant, which indicated to the jury that Mr. Griffin's objections were invalid and of no value. The comment referred to occurred as follows:

"Q. [Directed to Mr. Gibson] What was the substance of it [referring to what Mr. Whetstone said during his conversation with Gibson at the west end of the bridge]? Mr. Griffin: He has answered the question. Q. What was the substance of it? Mr. Griffin: I object to that as repetition as he has answered the question several times. The Court: Objection overruled. I don't believe that you should unnecessarily interrupt opposing counsel. Mr. Griffin: I have not unnecessarily interrupted him and I never interrupt at all unless I have a valid objection. The Court: You have made your objection. Proceed."

While perhaps the trial court should not have used the language above set out, we are of the opinion appellant was not prejudiced thereby. No exception was taken to the court's ruling.

Many objections had been made to the testimony offered by the state, and the particular objection here made was not based on the ground that the question was not proper, but only that it was repetition. Mr. Gibson had been a reluctant witness, and the prosecution had some difficulty in getting him to answer the questions propounded, the witness many times answering: "I just can't remember what he said."

■ It is next contended that appellant was prejudiced by the following question asked Mr. Gibson by the prosecutor:

"Q. Didn't you tell your attorney that you thought Whetstone was going to kill you? Mr. Griffin: I object to that as being incompetent for any purpose. The Court: Objection

sustained. Q. Did you tell your attorney, or anybody else, that you were afraid for your life? MR. GRIFFIN: Object to that on the same ground, incompetent. THE COURT: It is a communication between him and counsel. I don't know whether he should testify on that— Q. Did you tell anybody besides your attorney that you were afraid for your life? A. After when? MR. GRIFFIN: I object to that as incompetent for any purpose. A. Before that, no."

While the question may have been objectionable, it seems to us that, in view of the answer of the witness, if any prejudice resulted, it would be against the state. We do not see how the question propounded could instill in the minds of the jurors that appellant had committed another crime, namely, that he had threatened to take the life of the witness. At most, it seems to us the question only attempted to bring out the state of mind of the witness.

 It is next contended that by the following question the state deliberately sought to inject in the minds of the jurors the fact that appellant and his counsel had conducted themselves improperly.

"Q. Did you [Mr. Gibson] have difficulty remembering things lately? A. Lately? Q. Yes. A. No more than any other time as far as I know. Q. Since you saw Mr. Griffin have you had difficulty remembering things? A. Did I have what? Q. Have you had difficulty remembering talking to Mr. Griffin? A. No, sir."

No objection was made to any of the above questions, nor was any motion made to strike the answers. Mr. Gibson had stated that he had talked to Mr. Griffin, which, of course, was perfectly proper, but, as stated, it is apparent from his testimony that he was a reluctant witness. Counsel for appellant apparently did not think the questions were improper or that the answers given were prejudicial, for, as we have stated, he made no objection to the questions, nor did he move to strike the answers. In view of the situation presented, we are of the opinion no claim of error can now be based upon the above questions and answers.

All of the above claims of error and prejudice go to the proof offered in support of the first count of the indictment.

We shall next discuss the questions raised by appellant relative to the testimony introduced in support of count II of the indictment.

 It is first contended that the court permitted the witness Lind, on his direct examination by the prosecutor, to testify, over objection by appellant, to conversations had with Robert Gourlay, his alleged agent, out of the presence of appellant. The prosecutor stated that this testimony was offered for the purpose of laying the foundation for Mr. Gourlay's testimony. The questions asked, the objections thereto by Mr. Griffin, the admonitions of the court to the jury relative to its admission of the testimony, and the answers of the witness cover the greater part of pp. 124 to 127 of the statement of facts. It is difficult to show just what occurred without quoting in their entirety the pages referred to. However, it is apparent the purpose of the state was to show the agency and the instructions given by Lind to his alleged agent, Robert Gourlay.

It is not claimed by appellant that Lind could not authorize his agent to submit a proposition to appellant relative to obtaining Whetstone's influence in reducing the bond and permitting Lind to use the county bridge over the Snoqualmie river. It is not always possible for a party to establish his case by one witness, and the trial court has considerable discretion in regard to the order in which the proof shall be made. Mr. Lind had testified, without objection, that he had taken the matter up with Robert Gourlay, and had made arrangements with Gourlay to see Whetstone; that after Gourlay saw Whetstone, he reported to Lind. The following question was then asked: "Was a proposition made to you as to what it would cost you at any time?" Then followed the objection by Mr. Griffin and a colloquy between the court and the prosecutor, after which the court stated:

"THE COURT: Ladies and gentlemen, testimony sometimes is submitted to you out of order by reason of the fact that the connecting testimony has not been offered yet, and in this case you heard the prosecuting attorney say that it will be offered later. I will let it go in subject to further motion in the event that the matter is not offered later. MR. GRIF-

FIN: I object to it. That objection goes to all this testimony on the ground that it is incompetent, no agency shown and there isn't a proper foundation laid for this kind of testimony attempted to be elicited. THE COURT: The testimony will go in at that time as you have heard the assurance of the opposing counsel, and reserving to you the right to again call it to my attention."

While we are of the opinion that Mr. Lind's testimony at this time shows that he had authorized Robert Gourlay to see Mr. Whetstone in his behalf relative to the bridge matter, it may be that the last question was objectionable on the theory that as yet it did not appear how much money, if any, Lind authorized Gourlay to offer to Whetstone.

After the court's ruling, the following questions were asked:

"Q. I will make it as narrow as possible. Was there any statement made to you or any understanding or anything about some money from you, and what amount of money it would cost on this bridge? MR. GRIFFIN: The same objection. Q. For a right to cross this bridge?"

The court again admonished the jury that it would allow the witness to answer on the theory that the connecting testimony would be supplied. The last question was not answered.

"Q. Mr. Lind, was there any suggestion made to you about the amount which would be required to get the right to use this bridge? MR. GRIFFIN: The same objection, calling for a conclusion. THE COURT: He may answer with the reservation I made. A: It came about in a roundabout way. He suggested that having the bridge would cost me $3,000 and if we furnished the bond it also would cost $3,000. And I said I wouldn't pay that $3,000 to reinforce and to repair the bridge. And he said I might be willing to contribute something, but nothing said as to the amount. THE COURT: What person was that conversation with? Q. Who was that with? A. The conversation was with Bob Gourlay. Q. Did you talk with Bob Gourlay later on the same matter? A. Yes. Q. Was there any other figure named? A. Well, we talked on the price of $1500.00. And later on after I had talked to Bob I said that I would give him $750.00. Q. And did you turn any money over to Gourlay on account of that to give to anyone? A. I turned over $750.00 to Gourlay. . . .

Q. When did you turn this money over to Gourlay, about?
A. I gave $750.00 to Gourlay, put in an envelope and put it down on the table and said to Bob that was $750.00 for commissioners."

It further appears from Mr. Lind's testimony that Gourlay was authorized to see Whetstone and turn over to him the seven hundred fifty dollars.

As stated, it seems to us it sufficiently appears that, if the matter in regard to which the prosecutor questioned Mr. Lind needed to be connected up with other testimony, it was so supplemented by Robert Gourlay's testimony, which we have hereinbefore set out. We find no reversible error in the procedure employed by the trial court.

 It is next contended that the prosecutor was allowed to repeatedly make statements as to his theory of the case and as to what a witness would testify, if permitted, all in the presence of the jury.

It is true that in some instances the prosecutor, after objection made to a question, would make a statement of his theory for asking the question and why he thought it was permissible. The second time Mr. Griffin made an objection that the matter should not be argued in the presence of the jury, the court excused the jury and made the following comment:

"THE COURT: I am disinclined to send the jury out of the box. I don't like to do that but I do occasionally on counsel's insistence. I think that a jury is intelligent enough to obey the orders of the court."

While we think it the better practice, when counsel desires to make any extended argument or wishes to state what a witness, if permitted, would testify, to ask to have the jury excused in order that the testimony to which the objection is made be not brought before the jury, however, if the jury were excused every time a lawyer made some statement relative to a ruling of the court, or every time a lawyer stated what his theory in asking a question was, trials would never be concluded. The controlling question to be answered, in our opinion, is whether or not counsel, in making such statements, is acting in good faith, and whether or not

what is said is in fact prejudicial. The trial court was apparently of the opinion that the acts of the prosecutor were not prejudicial to appellant, and we are unable to say that in so concluding and denying appellant's motion for a new trial, the court abused its discretion.

██ ██ Appellant contends that the court abused its discretion in eliminating cross-examination when it sustained an objection to the following question asked Mr. Lind on cross-examination: "Was that intended as a bribe for anybody?" Mr. Shorett objected to the question and his objection was sustained. Even if the intention of the bribe giver was material under § 2321, *supra*, we do not think the above question a proper one. Clearly, it called for a conclusion. The facts and circumstances surrounding the giving of the compensation, gratuity, or reward could be shown to establish such intent. However, we do not think the intent of the bribe giver is material herein, either under the provisions of the statute or the decisions construing such statutes, where the defendant is charged with receiving a bribe. See *Sims v. State*, 131 Ark. 185, 198 S. W. 883.

██ It is next contended that the prosecutor, by his cross-examination, attempted to discredit appellant, in that by his questions he tried to implant in the minds of the jurors the idea that appellant had improperly secured the rezoning of property for the witness Armstrong. This examination occurred on p. 225 of the statement of facts. We have examined the record, and we find no objection made by counsel for appellant to any of the questions asked by the prosecutor.

██ It is contended that the following statement of the court was a comment on the evidence, and is another instance showing that appellant did not have a fair trial. We quote the statement found on p. 266 of the statement of facts.

"THE COURT: I am not ruling that you cannot testify about any question that was suggested by opposing counsel covering his answers, as to just why he did so, but I don't think you can introduce in the record something which has no particular basic proof as to its being a fact in the case."

No exception to the above statement was taken by counsel for appellant. The statement was made by the court in explaining its ruling, and did not indicate the court's opinion as to the truth or falsity of any evidence in the case. See *State v. Brown,* 19 Wn. (2d) 195, 142 P. (2d) 257.

It is next contended by appellant that the prosecutor was permitted, on recross-examination, to interject into the case "what would appear to be evidence of the commission of another crime," by asking the following question of Mr. Whetstone: "Did your employees raise a $4,000 fund for defense in this case?" The witness was permitted to answer, over the objection of Mr. Griffin. His answer was "No." If the question was objectionable, we think no prejudice resulted, in view of the negative answer by appellant. It is doubtful if any objection was taken to the question as finally read. While there was considerable argument between counsel and the court at this point, the record seems to show that Mr. Shorett finally withdrew the question.

We are asked to consider instruction No. 8, as given, but, as hereinbefore stated, no exceptions were taken to any instructions given, and therefore we cannot consider any objections now made to such instructions.

 The last question raised by appellant under assignments Nos. 6 and 7, to which we shall refer, concerns a statement made by the prosecutor. Mr. Shorett had been cross-examining Mr. White, one of appellant's witnesses. This man had driven the car for Mr. Whetstone when he went to the meeting with Mr. Gibson at the west end of the bridge. This witness had admitted that he had been convicted of some liquor charge in the Federal court. Mr. Shorett asked Mr. White whether or not he was in the courtroom during the previous trial, to which he answered: "I was there and came back." The witness was then asked if he didn't leave during the course of the trial when they were asking for him, to which he replied that nobody asked for him.

"Q. Didn't you hear somebody say as you were going they were asking you to come back? [Objection by Mr. Griffin.] THE COURT: I don't think the question—[Then followed the statement to which objection is made.] MR. SHORETT: I

want to show that—it goes to show he was trying to hide out."

Mr. Griffin objected to the statement as being highly prejudicial, and asked for a mistrial. The court then instructed the jury to disregard the comment of counsel.

Appellant contends that it is the combination of all the acts of the prosecutor and the claimed erroneous rulings of the court that resulted in appellant not having had a fair trial.

We have endeavored to set out so much of the record as appears to us to be necessary to show the situation at the time the claimed prejudicial questions were asked and statements made by the prosecutor, and the reasons of the trial court in admitting the testimony to which objection was made. We do not commend the practice of counsel, either in a civil or criminal case, making statements before the jury of facts not supported by the evidence or reasonably inferable therefrom. However, if this court were compelled to reverse every case in which counsel may have made statements not entirely supported by the record, in an attempt to justify a question propounded, regardless of whether or not such statements were in fact prejudicial, many cases would have to be reversed which otherwise, on the record, clearly should be affirmed.

We must and do assume, in support of our jury system, that jurors are men and women of reasonable intelligence; that it is their desire to return verdicts supported by evidence and according to the court's instructions; that when statements are made by counsel and such statements are stricken, they will disregard such statements; that when a question is asked and an objection sustained, they will understand that for some good and sufficient reason the court believed the question not to be proper; that the jury understands that respective counsel have partisan feelings toward their clients; and that juries must be given credit for understanding that in a criminal case the state must *produce evidence* sufficient to prove, beyond a reasonable doubt, the elements of the crime charged, as instructed by the court.

The trial judge in the instant case has had many years of experience, and by his denial of appellant's motion for a new trial has shown that he was convinced that appellant had had a fair trial. After a consideration of all the matters and things complained of under assignments Nos. 6 and 7, we are in accord with the conclusions reached by the trial court, in so far as the questions raised by such assignments are concerned.

We now come to the last question raised by appellant, under assignment No. 8. It is appellant's contention that he should be granted a new trial because of the misconduct of two jurors, namely, Elmer Johnson and James Gervalia.

It is contended as to juror Gervalia that, after he was summoned to appear as a juror for the term during which appellant was to be tried, he made certain statements to the effect that he was prejudiced against appellant and other county officials indicted by the grand jury; that, after he had served as a juror in the Whetstone case, he was called to serve in the case of State v. Archie Phelps, and on his *voir dire* examination in the latter case he admitted that there was some uncertainty in his mind as to whether or not he could accord to Phelps a fair trial.

As to juror Johnson, it is contended that after he had been selected as a juror in the Whetstone case, and on the second day of the trial, after having been admonished by the court that the jurors were not to discuss the case with each other or with anyone else, one F. Ray Hunnicut heard Johnson say to another juror, "He is sure guilty."

It may be admitted that, as appears from the *voir dire* examination of these two jurors, they were qualified to act as jurors in the instant case.

We have examined the affidavits filed by respective counsel bearing upon the question here presented, in support of appellant's motion for a new trial. There was extended argument by counsel for the state and appellant on the motion for new trial and motion in arrest of judgment. Relative to juror Elmer Johnson, his affidavit filed in opposition to the motion for new trial states:

"That neither before nor during the trial, did he ever make a remark to the effect that the defendant was guilty, or 'He sure is guilty' or 'He is sure guilty,' or anything to that effect."

At the time the motion for a new trial was argued, there was on file an affidavit of one Edward R. O'Brien, in which he stated that he heard a discussion between Robert Schuehle and juror Gervalia, at Boeing plant No. 2; that, according to Mr. Gervalia, he (Gervalia) had been called for jury duty, but did not know what trials he would be serving on; that Mr. Gervalia stated that

". . . if he had to serve on the trials of the county officials he would hang them because he felt that they were guilty."

In opposition to Mr. O'Brien's affidavit, the affidavit of Mr. Gervalia was filed, in which he stated:

"That a discussion did take place between Robert Schuehle, Edward R. O'Brien, and affiant, in which Mr. Schuehle stated in effect that if he were on a jury he would 'hang all politicians.' That affiant does not recall whether or not he commented upon the statement of said Schuehle in any way.

"That affiant's mind was open at the time of the trial of this cause, and that he was conscious of no preconceived prejudice or judgment on the issues involved.

"That affiant does not recall ever making any statement indicating any prejudice against the defendant, or any other person charged by indictment returned by the grand jury."

Mr. Gervalia also signed an affidavit prepared by counsel for appellant, which contains the following statement:

"That this affiant recalls having some conversation with the aforementioned individuals [O'Brien and Schuehle] at approximately the time and place mentioned, prior to this affiant's being sworn as a juror in the above entitled cause, and this affiant is unable to state whether or not he made the statement attributed to him in the affidavit of Edward R. O'Brien. That if he did make such a statement, such statement was based upon the supposition of politicians (J.R.G.) being proven guilty."

At the time the affidavit was presented by counsel to Gervalia, the latter deleted the following paragraph, and initialed the deletions on the margin "J. R. G.":

"That the statement attributed to by Edward R. O'Brien, 'that if he, Gervalia, were to serve on the trials of the county officials indicted, he would hang them because he felt they were guilty', correctly stated his impression and feeling at that time. That by the phrase 'hang them', this affiant did not mean that he would literally attempt to hang the county officials so indicted, but rather, find them guilty."

The arguments on the motions for new trial and for arrest of judgment cover from p. 488 of the statement of facts to p. 573, and all the matters we have discussed in this opinion were presented by respective counsel and argued to the court. It will be noticed that, at the time of the above arguments, no affidavit of Schuehle, relative to Gervalia, was on file.

The trial court, after hearing the arguments relative to these two jurors, and after considering the affidavits then on file, stated:

"The Court: I want to hear the other side. I would prefer that the people be called and give their own impression. That is the reasonable thing to do because I find that that must be determined as a question of fact, as to the integrity or lack of integrity of their actions. That is what we should do.

"I do not want to do that on two or three of these affidavits that are presented by counsel. The counsel are working for their side. They are biased in those things. They are interested on one side or the other."

The result was that on July 10, 1947, Mr. O'Brien, Mr. Schuehle, and Mr. Gervalia were brought before the court, placed under oath, and examined at some length by counsel for appellant, the prosecutor, and the court. Mr. Schermer objected to the examination, after which objection the examination went forward. Mr. O'Brien stated that the conversation was probably started by Mr. Schuehle saying "that he believed that the county officials as a whole were guilty."

"Q. Was there any comment at that time or preliminary remark about the present defendant, Mr. Joseph Whetstone? A. I don't believe so. Q. Did anyone in the course of that conversation profess to know Mr. Whetstone, or be interested in him at all? A. No."

Mr. O'Brien further stated that after Schuehle made the above remark, Gervalia stated: " 'Sure. I believe they are guilty and they ought to be hung too.' " Mr. O'Brien admitted that he might be mistaken as to who made the statement attributed to Gervalia, but he did not believe he was. O'Brien admitted that after he met Don Whetstone, appellant's son, he was active in helping to obtain a new trial for appellant.

The witness Schuehle stated:

"A. I said that I thought the politicians were a bunch of crooks and they all ought to be convicted. . . . Q. Did anybody else present in that group and in that conversation question that or coincide with what was said or give any illustration concerning these things they said represented corruption in politics? A. Not that I recall. Q. Was the name of Mr. Whetstone, Joseph A. Whetstone, mentioned? A. I don't believe so. . . . Q. Did you recall of Gervalia being there at that time in the group? A. Oh, yes. Q. Do you recall his speaking at that time, expressing an opinion? A. I don't recall his speaking at all."

Mr. Gervalia was examined at some length, and the substance of his testimony was that he remembered Schuehle stating that if he had an opportunity to serve on a jury where politicians were being tried, he would hang them all.

"Q. What answer did you make to his comment to him, if any? A. I don't recall making any comment. Q. Didn't you make a remark as to the gravity of the comment? A. No, not that I recall. . . . Q. Did you know Mr. Whetstone or anyone else who had been indicted by that grand jury? A. No, sir. Q. Had you seen or talked to anybody concerned who personally knew any of these several people? A. No. Q. Had you any reason to think that any of these defendants were guilty or not guilty other than the fact they were indicted? A. No, sir."

The witness was then asked relative to his *voir dire* examination.

"Q. You possibly didn't answer orally, but actually did you intend to tell the court at that time that you had not formed or expressed any opinion concerning the case before you? A. I had not formed any opinion. Q. Did you have any formed opinion or prejudice against Mr. Whetstone when you sat here on the panel? A. No, sir, none whatever. Q. Had anyone talked to you about the case prior to the morning when you were received here in the case? A. The Whetstone case? Q. Yes. A. No, sir. Q. Had anyone at any time mentioned the case to you in an unfavorable way? A. Not the Whetstone case. What was said by Mr. Schuehle, he was discussing politicians in general. . . . Q. Did Mr. Schuehle's comment effect your decision at all in this case? A. No. I have heard that before and I have heard that said by different people."

Mr. Gervalia also testified relative to Mr. Griffin coming to his home with the affidavit hereinbefore referred to, stating that he struck out the word "defendant" and put in the word "politicians," and that he also struck out the paragraph hereinbefore referred to. Mr. Gervalia was again asked the question:

"Q. Mr. Gervalia, did you make any statement on the occasion stated there, that if you were on the jury you would hang all politicians? A. No, I wouldn't say that. I don't know anything about any particular politician. I have no feeling against them."

The conclusion of the trial court was that the two jurors were not prejudiced or biased, and that the jury's verdict must be accepted. It was also the conclusion of the court that appellant had been accorded a fair trial.

■■ In our opinion, neither the case of *Heasley v. Nichols,* 38 Wash. 485, 80 Pac. 769, nor *State v. Swafford,* 88 Wash. 659, 153 Pac. 1056, cited by appellant, is controlling on the question of whether or not Gervalia and Johnson were fair and impartial jurors. In the *Swafford* case, the juror Jasperson, as shown by an affidavit filed in support of a motion for new trial, had, prior to his being called as a juror, talked of the charge involved and of the defendant, had used an opprobrious epithet, and said: " 'If I was on the jury that tried him I'll bet he'd never get loose.' " or words to that effect. Jasperson did not unequivocally deny having

made the statement imputed to him. It will be noticed that in the cited case the juror had expressed a very decided opinion relative to the particular charge and the defendant involved. This court, in reversing the trial court and granting a new trial, stated:

"When it was shown by competent and positive testimony, and only partially denied and reservedly explained by the juror, *that one juror was not indifferent and impartial, but had a positive and declared opinion and a disclosed intention regarding the case* should he become a juror, it cannot be lightly passed or ignored." (Italics ours.)

In *Heasley v. Nichols, supra,* a civil case, a person, before he was called as a juror, had discussed the case, expressed an opinion, and then stated: " 'I would like to get on the jury, for I would give her all she sued for and a d—— sight more.' " These statements were not denied. We stated:

"It is plain that this juror was disqualified by reason of his bias and prejudice. He concealed the fact, and by reason of his misrepresentations was taken and permitted to sit upon the jury."

It is not seriously contended here that the court abused its discretion in concluding that Johnson was a fair and impartial juror, but appellant's contention is confined almost entirely to the juror Gervalia.

After an examination of the record, we are not prepared to say that the trial court abused its discretion in concluding that both these men were fair and impartial jurors. We are of the opinion that, as to each juror, a question of fact was presented for the trial court to determine, and the matter was one which rested largely in the discretion of the court; that on appeal the ruling of the trial court should not be disturbed, in the absence of a showing of an abuse of discretion. *State v. Rooney,* 2 Wn. (2d) 17, 97 P. (2d) 156, and cases therein cited.

We are of the opinion that this court, in the case of *Mathisen v. Norton,* 187 Wash. 240, 60 P. (2d) 1, recognized the procedure followed by the trial court in the instant case, in having brought before him and examined orally the juror Gervalia and the two men who participated in the conversa-

tion during which it is claimed Gervalia made the prejudicial statements.

The many questions raised by appellant in this case have necessitated an opinion of great length, but in view of the serious nature of the charges preferred, we have endeavored to answer all of the questions raised, notwithstanding the fact that in our opinion some of them have little merit.

We are convinced that appellant had a fair trial, that there was sufficient evidence, if believed by the jury, to establish each and every material allegation of both counts of the indictment, and that the court committed no reversible error.

For the reasons herein assigned, the trial court, in our opinion, properly denied the motion for new trial and the motion in arrest of judgment, and the judgment of the trial court entered upon the verdict of the jury on each count of the indictment is affirmed.

MALLERY, C. J., BEALS, STEINERT, and HILL, JJ., concur.

May 27, 1948. Petition for rehearing denied. Ordered that following statement be inserted in opinion: "Present counsel for appellant did not participate in the trial in the lower court."