283 So.2d 652

**Bobby James STAGGS**

v.

**STATE.**

**8 Div. 212.**

Court of Criminal Appeals of Alabama.

Aug. 14, 1973.

Rehearing Denied Sept. 25, 1973.

W. A. Barnett and Harold G. Peck, Florence, for appellant.

William J. Baxley, Atty. Gen., and Don C. Dickert, Asst. Atty. Gen., for the State.

WILLIAM P. POWERS, Circuit Judge.

Robbery: sentence, ten years imprisonment.

I

Bobby James Staggs was indicted, tried, convicted and sentenced to a term of ten years by the Circuit Court of Limestone County. Staggs' motion for a new trial was denied, and he appeals.

II

The defendant was driving an automobile which was stopped by Deputies Cleatus Craig and Norman Looney of the Limestone County Sheriff's Department at approximately 2:00 o'clock in the morning. Deputy Looney asked the defendant to step out for a check of his driver's license.

The passenger in the defendant's vehicle placed a gun in Craig's back and instructed him to remove his gun. The passenger then instructed Looney to come around the car. As Looney made a move for his gun Staggs said "don't do that or he will kill him." Staggs placed his right hand in his right front pocket which appeared to contain a small caliber pistol which he then pointed at the deputy. Staggs then forced the deputy to return his driver's license to him, and the passenger took the deputies' guns and forced the deputies down an embankment. The passenger left the scene in the patrol car, and Staggs left the scene in his automobile with Looney's pistol.

Testimony was offered and received over the objection of defendant concerning an attempt by him to bribe a witness. A witness also testified that defendant admitted having in his possession the property taken.

III

Defendant contends on this appeal that the evidence was insufficient to support a conviction.

Robbery at common law has been defined as the felonious taking of money or goods of value from the person of another or in his presence against his will by violence or by putting him in fear. The evidence shows that the defendant was driving the automobile in which both he and the passenger were riding, that he made the statement during the course of the crime, "Don't do that or he will kill him," that he drove the automobile away from the crime leaving the deputies, that he had his hands on what appeared to be a gun and pointed it at the deputy during the course of the crime. The defendant admitted that he had the property taken in his possession or control.

Title 14, § 14. Code of 1940 provides as follows:

"The distinction between an accessory before the fact and a principal, between principals in the first and second degree,

in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors."

It has been repeatedly held that any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether the one so contributing is present or not, brings the accused, under such circumstances, within the influence of T. 14, § 14. McMahan v. State, 168 Ala. 70, 53 So. 89; Davis v. State, 36 Ala.App. 573, 62 So.2d 224.

The defendant also argues that the trial court erred in allowing evidence that the accused attempted to bribe a witness. This contention is without foundation. A party's attempt to suppress evidence is admissible against him. Liles v. State, 30 Ala. 24; Whatley v. State, 209 Ala. 5, 96 So. 605; Woodard v. State, 253 Ala. 259, 44 So.2d 241.

The defendant further argues that the trial court erred in the refusal to give the following requested charge:

"4. The court charges the jury that an indictment for robbery also embraces the charge of larceny."

A defendant is entitled to a charge on lesser offenses included in the indictment if there is any reasonable theory from the evidence which would support the position. Stovall v. State, 34 Ala.App. 610, 42 So.2d 636, cert. den. 252 Ala. 670, 42 So.2d 639. However, it is not error, and a conviction for robbery should not be reversed for refusal of the trial court to charge on larceny unless there was a reasonable theory from the evidence which would not support a robbery conviction but would support conviction for larceny. In this case the evidence could only establish the crime of robbery, and the refusal of the trial court to charge on larceny as requested was not error. Kelley v. State, 235 Ala. 5, 176 So. 807, reversing 27 Ala. App. 584, 176 So. 806; Brooks v. State, 36 Ala.App. 310, 55 So.2d 366.

The defendant's other claims of error relate to alleged prejudicial argument of counsel which are also without merit and are not supported by the record in that the objections of defendant which were overruled did not sufficiently specify the statements of the State's counsel.

## IV

We have considered the entire record in this case, and from this examination we conclude that error is not made to appear.

The foregoing opinion was prepared by Hon. WILLIAM P. POWERS, Circuit Judge, temporarily on duty on the Court pursuant to subsection (4) of § 38, T. 13, Code 1940, as amended; the Court has adopted his opinion as its own.

The judgment below is hereby

Affirmed.

All the Judges concur.

## ON REHEARING

PER CURIAM.

Appellant claims that the opinion on original deliverance states certain "facts" inaccurately. An appellate court does not strictly make "findings" of fact. Rather it sets forth the tendencies of the evidence which appear to have convinced the jury.

In this instance we shall quote from the direct examination of Deputy Looney:

"Q All right, describe how the car was being operated when you followed it, in your judgment, three miles.

"A  The car was being driven in an erratic manner on 31 South. What appeared, the driver might be drinking.

"Q  What do you mean by erratic manner?

"A  Means crossing the center line, I don't know how many times exactly, and he would go back toward the edge of the road.

"Q  You recall, or do you not, this has been over a year, the speed that you followed the car?

"A  I don't recall that.

"Q  Do you have a judgment as to whether it was a normal rate of speed or —

"A  It was normal rate of speed. It wasn't a high rate of speed.

"Q  All right, did you stop the car then?

"A  Yes, sir.

"Q  Were you driving the Sheriff's car?

"A  Yes, sir.

"Q  All right, when you stopped the car, did you pull up behind it or beside it or what?

"A  We pulled up beside it the best I remember, and turned the blue light on it and dropped behind it when we pulled to the side of the road.

"Q  You first pulled up beside it, and after he pulled off, you dropped behind it?

"A  Yes, sir.

"Q  All right, when you got there, did he stop?

"A  Yes, sir.

"Q  Did you all stop behind him?

"A  Yes, sir.

"Q  How far behind, in your judgment?

"A  About five feet.

"Q  All right, did you have your lights shining on the back of this '62 Ford automobile?

"A  Yes, sir.

"Q  Could you see the tag?

"A  Yes, sir.

"Q  You recall anything about the county it represented?

"A  41 tag.

"Q  Do you know county that represents?

"A  Lauderdale County.

"Q  All right, what, if anything, did you do after he stopped there, and what, if anything, was—

"A  I got out of the car and the driver of the other car got out and come in back to meet me, and I asked him for his driver's license, and he handed me his driver's license.

"Q  All right, did you look at them?

"A  Yes, sir.

"Q  What did they say?

"A  Given name as Bobby Staggs. I recall a Florence address. That's all I recall.

"Q  Bobby Staggs from Florence was on the license tags?

"A  Yes, sir.

"Q  All right, could you see him when he got out of the car?

"A   Yes, sir.

"Q   Get a good look at him?

"A   Yes, sir.

"Q   Do you see that person in the courtroom today?

"A   Yes, sir.

"Q   Point him out to the jury.

"A   He is the defendant seated to my right over here.

"Q   All right, what, if anything, took place or happened after the defendant got out and handed you the license that had Bobby Staggs on it?

"A   Deputy Craig walked up to the side of the car and was having a conversation with another occupant of the car, which I couldn't hear their conversation, and this other occupant got out, and Deputy Craig was looking in the car and found a pistol in the floor board, and turned to ask the subject for—if he had a permit, and that's about all I could hear of their conversation.

"Q   What did you see?   Did you see anything between you and the defendant here and Cleatus and the other man?

"A   I really couldn't see what was going on.   I could tell by Cleatus' expression he was apparently in trouble.

"MR. PECK: We object to that, if it please the Court, as being an illegal conclusion as to what he could tell by his expression, and move to exclude anything in consideration of the jury.

"THE COURT: Overruled.

"Q   You realized that Craig was in trouble?

"A   Yes sir.

"Q   What happened then?

"A   The other subject then started backing back toward the patrol car, and when he got just past the right front fender of the patrol car, the best I could hear him, he said to me to come around toward him with my hands in front of me.

"Q   What did you do when you realized he was in trouble?

"A   I made a move toward my gun.

"Q   What happened when you made a move toward your gun?

"A   The man which I checked his license told me, 'don't do that or he will kill him.'

"Q   The defendant said, 'don't do that or he will kill him'?

"A   Yes, sir.

"Q   All right, then what—where did the defendant have his hands?

"A   He had his right hand in his right front pocket.

"Q   Jacket or pants, trousers?

"A   Pants pocket.

"Q   All right, when you looked at his pants, trousers there, what did it look like?

"MR. PECK: We object to what it looked like.

"THE COURT: I sustain it.   You can describe it.

"Q   Describe what you saw.

"A   It appeared that it might have a small caliber pistol in there in his pocket.

"Q   And was the [sic] what appeared to be a small caliber pistol, was it pointed toward you?

"A   Yes, sir.

"Q   And he said something about advising you not to go over there or he will kill him?

"A   Yes, sir.

"Q  And you say the other man on the other side of the car started backing up, and what happened then?

"A  He backed to the right front fender of the patrol car, and as he got back behind the headlights, he advised me to come around towards him between the patrol car and the car we had stopped with my hands in front of me.

"Q  Where?

"A  In front of me, or away from my gun.

"Q  What was the defendant here doing?

"A  As I started back toward him, he said give him his license back, and the best I could tell, he stood there once I got—

"Q  To give the license back?

"A  Yes, sir.

"Q  Did he still have this object in his pocket when you handed the license back?

"MR. PECK:  We object to leading the witness.

"THE COURT:  I will overrule that objection as to that particular question. You may answer.

"MR. PECK:  We reserve an exception.

"A  He still had his hand in his pocket in the same manner.

"Q  What did they do with you all after you got back to the car you just told the jury about?

"A  He took my gun, and then he told us to walk down the bank.

"Q  You say 'he'. Was it the defendant or the other party?

"A  That was the other subject.

"Q  Could you see the defendant while this was going on?

"A  No, sir.

"Q  And this other party led you off down the bank there?

"A  He didn't lead us. He told us to go down and he stood there behind the right front fender of our patrol car and told us to walk down the bank, with the pistol pointed at us.

"Q  You saw the pistol?

"A  Yes, sir.

"Q  And you walked down the bank?

"A  Yes, sir."

Deputy Craig testified in part:

"Q  Did you and Looney get out of the car at the same time?

"A  Yes, sir, he got out on the driver's side and I got out on the other side.

"Q  Same time?

"A  Yes, sir.

"Q  And you say the driver of the Ford was walking back toward your car?

"A  Yes, sir, he met Looney.

"Q  How much room was there between the two cars?

"A  I would say six foot probably, approximately.

"Q  About as far as from here to that stand?

"A  Yes, sir, something like that.

"Q  Now, where did Officer Looney and this man driving the Ford car meet?

"A  About the back of the Ford car. Back of it.

"Q  About this far in front of your headlights, right?

"A  He was over to the side of the car.

"Q  Over to the side a little bit?

"A  Yes, sir.

"Q All right, and the man driving the Ford car, I believe, would be facing your car, wouldn't he?

"A Yes, sir.

"Q And Officer Looney's back was to you?

"A He would have been facing the man, but I was on the other side of the car.

"Q All right, sir, did you hear Officer Looney ask for the man's driver's license?

"A I did. I heard him.

"Q Did you see the man give him his license?

"A No, sir, I was on the other side of the car and I couldn't see that well. I was talking to the other man.

"Q All right, sir. Now, this was just a regular Ford convertible, wasn't it? Nothing unusual about it as far as size or anything, was there?

"A No, just a Ford convertible, '62.

"Q And the car would [sic] about as wide from me to you, wouldn't it?

"A I think so.

"Q And Officer Looney was standing over here, and you were right across— you wouldn't be any further than this from Officer Looney at any time, would you?

"A No, sir.

"Q Did you ever look at the man who was driving the car?

"A Not in the face because he was on the other side of the car.

"Q You couldn't see over the car?

"A I was busy talking to the other fellow. I wasn't talking to him.

"Q Did you tell this other fellow to get out of the car?

"A No, sir.

"Q What did he do, come out on his own?

"A Just got out and stepped toward the back of the car.

"Q Did you search him or anything at that time?

"A No, I did not.

"Q During this whole thing, did you ever have any conversation with the man driving the car?

"A No, sir.

"Q Did the man who was driving the car ever make any threats of any kind toward you?

"A No, sir.

"Q Did the man who was driving the car do anything that put you in fear or made you do what you did?

"A I didn't have a conversation with the man driving.

"Q All of yours was with the other man, right?

"A Yes, sir.

"MR. PECK: I believe that's all.

"REDIRECT EXAMINATION

"EXAMINATION BY MR. NELSON:

"Q Cleatus, when you parked up behind the car, did you have your headlights on?

"A Yes, sir.

"Q In other words, when you pulled up behind it, your headlights were shining on the back of the '62 Ford?

"A Yes, sir.

"Q Were the lights—when the driver got out, the lights would be on him, and this other fellow got out, the lights on him?

"A Yes, sir.

"Q Now, he has asked you if you were ever threatened. Do you consider when the pistol was in your back—

"MR. PECK: We object to what he considers.

"MR. NELSON: Your Honor, he asked was he threatened and—

"MR. PECK: Your Honor, I—

"MR. NELSON: Meaning of threat is.

"THE COURT: All right, what is that?

"MR. PECK: I asked Mr. Craig if the man driving the car ever threatened him.

"THE COURT: I will sustain it as a matter of argument.

"Q Was the man who was driving the car and the man who put the pistol in your back together, Cleatus?

"MR. PECK: We object to together. We object to that as calling for an opinion.

"THE COURT: Overruled.

"Q They was together, you say?

"A They were in the same car.

"Q When you saw this '62 maroon colored convertible down there at the jail there, do you recall if it still had that 41 [Lauderdale County's number] tag on it?

"A It didn't have a tag of any kind on it.

"Q The tag had been removed?

"A Yes, sir.

"Q This was some how many days after it? Next day, or what?

"A Next day.

"Q This was between two and three o'clock in the morning?

"A Yes, sir.

We consider that the application for rehearing is due to be

Overruled.

All the Judges concur.