299 So.2d 756

**Bobby James STAGGS**

v.

**STATE.**

**8 Div. 294.**

Court of Criminal Appeals of Alabama.

July 16, 1974.

Rehearing Denied July 30, 1974.

**316**

John Tucker, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and Sarah M. Greenhaw, Asst. Atty. Gen., for the State.

LEIGH M. CLARK, Supernumerary Circuit Judge.

There has been an inordinate delay in the submission of the appeal in this case, which is from a judgment of conviction and sentence to imprisonment in the penitentiary for a term of seven years, rendered on September 14, 1971. The appeal was taken promptly thereafter. A motion for a new trial was filed, which was overruled by the trial court on October 13, 1971. A transcript reached this Court on July 19, 1972, and did not contain a transcript of the evidence. On August 22, 1972, appellee filed a motion to strike the record and to dismiss the appeal, which motion we granted on September 12, 1972. On motion to reinstate the appeal, supported by copies of order of the trial court at intervals of thirty days extending the time for the court reporter to file a transcript of the evidence with the clerk of the trial court, we set aside the previous order of dismissal and reinstated the appeal. A transcript of the evidence was filed by the court reporter with the Clerk of the Circuit Court on December 22, 1973. In the meantime the Clerk of this Court was apprised by the court reporter and by counsel for appellant that by reason of the heavy load of the court reporter an earlier transcription had been prevented. The transcript of the evidence, accompanied by a certificate of the Clerk of the Circuit Court, was filed with the Clerk of this Court on January 18, 1974. The case was submitted on briefs on appeal on April 11, 1974.

The indictment contained three counts, but the trial court gave the affirmative charge in favor of the defendant as to the third count, refusing such a charge as to each of the other counts. The jury returned a general verdict.

Appellant takes the position in his brief that the first count was brought under § 70, Title 14, Code of Alabama, which provides as follows:

"Any person who corruptly gives, offers, or promises any gift, gratuity, or

thing of value, to another person, with intent to induce or influence such person to commit any crime or offense punishable as a felony, shall, on conviction, be imprisoned in the penitentiary for not less than two nor more than ten years; and if the offense, for the commission of which such bribe is offered be less than a felony, then the person giving, offering, or promising such bribe shall, on conviction, be punished as if he had committed such offense."

The second count was brought under § 76, Title 14, Code of Alabama, which provides as follows:

"Every person who shall give, or offer, or promise to give, to any witness, or person about to be called as a witness, any bribe, upon any understanding or agreement that the testimony of such witness shall be thereby influenced, or who shall attempt by any other means fraudulently and corruptly to induce any witness to give false testimony or to withhold true testimony, in any case or in any manner not hereinbefore provided for, shall be guilty of a felony."

Each count charged defendant and three others with the alleged crime. In the first count it was alleged that they "did corruptly give, bribe, offer, or promist [sic] to give one Norman Looney, a witness, a certain gift, gratuity, or thing of value, to wit: $1,200.00 (twelve hundred dollars) with intent to induce or influence said Norman Looney to give false testimony or withhold true testimony, in a robbert [sic] case pending against Bobby James Staggs before the Limestone County Grand Jury empaneled September 8, 1969." The second count charged that they "did give or offer or promise to give to Norman Looney, a witness, subpoenaed before the Limestone County Grand Jury empaneled September 8, 1969, a bribe, of to-wit: $1,200.00, (twelve hundred dollars) upon an understanding or agreement that the testimony of said Norman Looney would be thereby influenced, to wit: the said

Norman Looney would give false testimony or withhold true testimony in a robbery case before the Limestone County, Alabama Grand Jury empaneled September 8, 1969."

There is enough in the evidence to convince us that the robbery case alleged in the indictment to have been then pending before the Grand Jury ultimately became the case of Staggs v. State, 51 Ala.App. 203, 283 So.2d 652, in which we affirmed a judgment of conviction and sentence of defendant to ten years in the penitentiary.

Evidence for the State consisted of testimony of Don Bradford, Bill Clark, Norman Looney and Sheriff Martin W. Evans.

Don Bradford testified that on August 6, 1969, he went to a barbecue place of James Thomas, a codefendant, in Madison County and on that occasion Thomas, along with John Crunk, another codefendant, called Bradford into the back and Thomas asked Bradford "how bad in trouble was the boys in." He replied, "What boys?", and Thomas said, "The boy that robbed Looney and them of their guns." Thomas said that "the boys in Florence" had called him to "try to get Officer Looney and them to change their testimony." The witness testified that Thomas said (and that Crunk entered into the conversation) that "if Officer Looney and them don't change their testimony" a contract would be let for them to be killed. They told him to try to get in touch with Looney, and he replied that he would go back home and see what he could do. He said that in that conversation Thomas stated that "I would get a thousand dollars if I would help them; that Officer Looney would get a thousand dollars; Officer Craig would; and Crunk and Thomas would get a thousand dollars each, which amounted to five thousand dollars, if the officers would change their testimony." Upon returning home in Limestone County, a short distance from the barbecue stand of Thomas in Madison County, the witness stated that he called Sheriff Evans, that Sheriff Evans met him

at the filling station and that they went to the Thomas barbecue place in separate cars that night; he talked again with Thomas and Crunk. He had a transmitter rigged on him and the sheriff and two others were "out back" to listen. He told Thomas and Crunk that he had not been able to get in touch with Looney because he had been out of town. They told him to get in touch with Officer Looney as soon as he could. He then returned home and the sheriff met him there with two men that had accompanied him in another car to the barbecue stand. After that day he had several conversations with the sheriff and several conversations with Thomas and Crunk. He let them know that he had been unable to get in touch with Looney. They said, "We need to get everything over with as quick as we can" and that "if they didn't get something done, they were going to let a contract on Officer Looney." On or about August 16, State Investigator Bill Clark came to his station and began to work with him. They went over to "Thomas Barbecue" that afternoon and on August 18 they went to the barbecue place and Thomas got on the phone and called Crunk and he came down. Officer Clark was not identified as such but as an old friend of Bradford who was working or hanging around the service station at the time. There were several trips between the places and several conversations. As to what specifically Looney was to do or forget, he was to just tell "that he wasn't sure that Bobby Staggs was the man that he arrested; that he stopped that night because, you know, he had gone through a lot of stress and strain since that time."; that Looney was supposed to have been through a lot of stress and strain and "couldn't remember who it was he stopped and got robbed by." He said that Thomas and Crunk said that the people in Florence weren't supposed to know that Crunk and Thomas were to get a part of the $5,000 but that the whole amount was to go to the two deputies. He testified that at the home of Tim Staggs, another codefendant, they were told by him that he didn't know

what had happened to Bobby Staggs, that he might be dead. There was some discussion to the effect that Bobby Staggs had gone to Minnesota to raise the $5,000 to bribe the deputies. Tim told him in the presence of Officer Clark and the others "Go ahead and go through with the deal, and I will raise the money myself." He testified that on September 9, 1969, the defendant, Bobby Staggs, drove up across the road from his service station, got out of the car and introduced himself. He asked the defendant whether he had the money and the defendant said, "No, because the bank had closed early that day," and stated that he would bring the money and be back the next morning and they agreed to meet at 10:00 o'clock. Reference was made to Officer Looney's gun, which had been stolen in the robbery, and Staggs stated he would bring "Looney's gun" with the money the next day. The witness said that on the same occasion Mr. Staggs told him that "he could have him killed for a thousand dollars if he didn't take the twelve hundred." After the defendant left, the witness called the sheriff. The defendant came back the next day with a lady that had accompanied him the day before. The witness introduced defendant to Officer Clark as the defendant walked into the station. The defendant "pulled out the money and started counting it like in his billfold, and handed it to me. And as he handed it to me, the state investigator got it and the state investigator, after he got the money, told him—he said, 'I am a state officer.' And at that time he placed him under arrest, and I got on the walkie-talkie and hollered for help." and within a few minutes the sheriff and some deputies came to the station. The defendant was arrested after he handed over the money.

It was shown on cross-examination of the witness Bradford that he was in a financial difficulty, that he was selling his service station and that he had issued some worthless checks. He was paid nothing by the sheriff other than $100 that was paid to his wife. On cross-examination it was also developed that at the time the money

was handed out by defendant, the grand jury had already met and Officer Looney had testified.

Officer Clark testified in detail as to various conversations he heard among Bradford, Thomas and Crunk, as to a conversation he and Bradford had with Crunk and Tim Staggs and as to a conversation among Bradford, Clark and Thomas in which Thomas had been told by Bradford, "Yes, we saw Looney, and he has decided to take the money." He also testified that he was present when Bobby Staggs came into Bradford's service station on September 10, and he observed Staggs counting out $1,200 in money, handing it to Bradford, that Clark intercepted the money and took it himself. He had previously signed an affidavit charging Crunk, Thomas and Tim Staggs with conspiracy to commit bribery, but he did not name Bobby Staggs. He stated the reason for his not naming Bobby Staggs was that he had never had any contact with Bobby Staggs at the time he swore to the affidavit, which was before he met Bobby Staggs and Bobby Staggs counted out the money and passed it toward Bradford.

Officer Looney testified that on September 9, 1965, he testified before the grand jury in the robbery case pending against Bobby Staggs. He said that at no time while he was deputy sheriff did Staggs offer him any money or anything of value to testify falsely or corruptly before any grand jury or "anything else" and that neither Crump nor Thomas made any such offer to him directly and that he never had any intention of taking a bribe from anyone and none was offered him. He said he was kept informed by Sheriff Evans as to the "bribery case" that "was in the working."

Sheriff Evans testified that he was not able to obtain a good reception as to the conversation between Bradford, Thomas and Crunk that was being transmitted to him by the radio rigged on Bradford. He also testified as to incriminating statements made by defendant after his arrest.

No evidence was presented by defendant.

Errors claimed by appellant are listed in appellant's brief as follows:

"1. Overruling defendant's motion to exclude the state's evidence.

"2. Refusing to grant defendant's motion for a mistrial.

"3. Refusing to exclude all the hearsay evidence given by the witnesses as it applied to defendant Bobby James Staggs.

"4. Refusing to exclude the state's evidence and direct a verdict of not guilty.

"5. Overruling defendant's motion for a new trial.

"6. Charging the jury that the objective of the conspiracy had been carried out."

Appellant makes the point that as the evidence shows conclusively that Officer Looney was in no way a party to any unlawful or improper act, and that there was never any agreement or understanding by Looney that he would swear falsely, defendant was entitled to the affirmative charge in his favor as to the second count of the indictment, wherein it is alleged that the crime was committed upon "an understanding or agreement that the testimony of said Norman Looney would be thereby influenced, to wit: the said Norman Looney would give false testimony or withhold true testimony." The State counters that, although there is no evidence or imputation of any dishonesty or improper conduct on the part of Officer Looney, the statute upon which the second count of the indictment was apparently based contains no requirement that the "understanding or agreement must be between defendant and the witness [Looney]" and that "an understanding or agreement by appellant, Crunk and Thomas with Don Bradford" meets the requirement of the statute.

Neither Section 70 nor Section 76, Title 14, Code of Alabama, limits the crime

there proscribed to that which constitutes a successful or consummated bribery. In each section a word of sufficient action is "offer," which generally denotes nothing more than an attempt, which even at common law was included within the concept of the crime. State v. General Daniel Morgan Post No. 548, 144 W.Va. 137, 107 S.E.2d 353.

Resolution of the particular question raised by appellant requires a determination of the meaning and application of "understanding" or "agreement," or both, as found in § 76 as well as in Count Two of the indictment. It is clear that there was never any agreement upon the part of Looney that he would testify falsely, and if Section 76 of the Code or Count Two of the indictment contemplates such an agreement exclusively, that is, an agreement that would include a commitment by Looney that he would testify falsely, which would require that the word "understanding" be limited to synonymy with such an agreement, the offense proscribed by Section 76 and charged in the second count was not committed.

■ We find that the language "agreement or understanding" has given pause to other courts in considering whether a particular statute relative to the subject of bribery has been violated when one of two actual or potential correlates, the one not charged with the crime, was not a guilty participant, and we come to the conclusion that the different results reached by the courts can largely be accounted for by the difference in the language of the statutes involved. That a statute can be so worded that a crime in the nature of bribery will not come within its ambit unless there is corruption on the part of both correlates, there can hardly be any question. On the other hand, statutes are clearly valid that are premised solely on corruption on the part of only one of the two.

In People v. Kerns, 9 Cal.App.2d 72, 48 P.2d 750 (1935), the statute applied where an executive officer "asks any bribe upon any understanding that his action upon any matter then pending in his official capacity shall be influenced." The court there said:

" . . . In the instant case, it is not necessary that there be an understanding, in the sense of an agreement, with the person unlawfully approached, but merely an understanding on the part of the bribe seeker himself that his official action shall be influenced. We are satisfied that the language of the information, the relevant parts of which we set forth above, is a sufficient allegation in this regard. People v. Beesly, 119 Cal. App. 82, 6 P.2d 114, 970; People v. McGee, 107 Cal.App. 56, 290 P. 61; People v. Seeley, 137 Cal. 13, 69 P. 693."

A different result had been reached in People v. Weitzel, 201 Cal. 116, 255 P. 792, 52 A.L.R. 811 (1927), in which it was held that the mere solicitation of a bribe would not support the conviction of an official under a statute providing punishment for one who receives or agrees to receive a bribe upon an understanding that the official would be influenced thereby, but the court laid emphasis upon the language "agrees to receive" a bribe and distinguished it from language in the statute prior to its amendment, when it did not contain such language but did contain the language "offers to receive" a bribe. The court reasoned that the change in the language in the respect noted warranted the conclusion that to sustain a conviction of a violation of the statute "there must have occurred a meeting of the minds of two persons."

By the statute now under consideration there is no definite requirement of an agreement on the part of the one to whom an offer of a bribe is made. It is to be noted that § 77, Title 14, Code of Alabama, is referable to one "who receives, or agrees or offers to receive, a bribe, upon any agreement or understanding that his testimony shall be influenced thereby."

Thus two separate statutory offenses are to be found in the two Code sections, as to which it is stated in 12 Am.Jur.2d Bribery, § 9, as follows:

"Where the crime of the bribe giver and that of the bribe taker are separate statutory offenses, it has been held that a corrupt agreement between the two parties is not necessary in order to establish the offense of bribery."

Immediately thereafter it is stated:

"A bribery statute may be so worded, however, that a corrupt understanding or agreement is essential to the commission of any offense under the statute."

citing People v. Weitzel, supra.

█ It is our opinion that the "understanding" contained in Section 76 and in Count Two of the indictment is referable to an understanding on the part of the one offering or giving the bribe and no such understanding on the part of the one to whom the bribe is offered is necessary.

Section 76, along with Sections 75, 77, 78 and 79 of Title 14 first became a part of the statutory law of Alabama by adoption of the Code of 1923, effective August 17, 1924. They obviously were designed to enlarge the area of crimes in the nature of bribery or attempted bribery. In Section 76 is the alternative "or who shall attempt by any other means fraudulently and corruptly to induce any witness to give false testimony or to withhold true testimony," suggesting, it seems, that the prime target was an *attempt* to bribe a witness or a potential witness, as distinguished from an actual bribery of him by corruptly obtaining his commitment to violate his oath as a witness. To require that there be an understanding or agreement by the witness that he would testify falsely would mean that an attempt to get him to thus commit himself expressly or impliedly that failed of its purpose would not be within the inhibition of the particular law. It would

mean that however overt and corrupt the offer of a bribe, the section is not violated in the absence of an agreement or understanding on the part of the offeree. Such a conclusion would thwart what seems to be the main objective of the section. The words "understanding" and "agreement," especially the word "understanding," have fulfilled their function when the gift, offer or promise is based upon an understanding on the part of the giver, offerer, or promisor that the testimony of the witness is to be influenced by the gift, offer or promise or is to ripen into an agreement to that effect if accepted upon that condition by the witness.

Contrary to the conclusion we are reaching is the case of Ex parte Jang, 25 Cal. App.2d 529, 78 P.2d 250 (1938), which relies upon People v. Weitzel, supra, but does not point out, as we have hereinabove done, that in People v. Weitzel, defendant was charged, in accordance with the language of the statute, with agreeing to receive a bribe and not with offering to receive a bribe, the latter having been condemned by the statute prior to its amendment, but was not included within the statute at the time of the defendant's alleged commission of the offense charged.

In agreement with Ex parte Jang is State v. Ferraro, 67 Ariz. 397, 198 P.2d 120 (1948), in which the court calls attention to some "apparently contradictory interpretations of related bribery statutes . . . to be found in the California decisions," but does "not attempt to reconcile the seeming inconsistency." Included in the references is People v. Kerns, 9 Cal. App.2d 72, 48 P.2d 750, to which we have previously alluded, and as to which we have attempted to show the distinction between it and People v. Weitzel, supra. In *Ferraro*, the court also cites People v. Brigham, 72 Cal.App.2d 1, 163 P.2d 891, in which it was held that as to a bribe-seeker the "understanding" was referable only to his "state of mind, and not the victim's."

We cannot subscribe to the reasoning that as to bribe-giver a bilateral understanding is necessary but that as to a bribe-seeker a unilateral understanding is sufficient.

In *Ferraro* the court states that "we appreciate the fact" that its interpretation of the statute considered "renders nugatory the provision of the statute . . . relative to offering a bribe to a witness where the offer is rejected," and that "If this produces an absurd or undesirable result the remedy lies with the legislature, for we must interpret the statutes as we find them." We think a more reasonable construction of a statute such as Section 76 is to the effect that the requisite state of mind involved is that of the bribe-giver, offerer or promissor and that as to a statute such as Section 77, the requisite state of mind is that of the actual or potential bribe-taker, and that an agreement between the two is not necessary.

Perhaps our view is not in accord with State v. Benson, 144 Wash. 170, 257 P. 236 (1927) correctly stated in 67 C.J.S. Obstructing Justice § 9, as follows:

> "*Bribery of witness.* Under a statute providing that bribery may be committed by giving, offering, or promising a reward to a person on an agreement or understanding that his testimony as a witness shall be thereby influenced, the gift, offer, or promise must be based on an agreement or understanding that the witness will be influenced, and a failure to procure the agreement leaves the crime incomplete, and is no more than an attempt to commit the crime."

Whether sufficient to materially distinguish that case from this or not, it should be noted that in *Benson* the word "bribe" found in the statute here involved, is not found in the statute there considered.

People v. Kathan, 136 App.Div. 303, ·120 N.Y.S. 1096 (1910) does not hold that a failure to procure the agreement leaves the crime incomplete. It holds to the contrary.

There was involved a statute using the word "bribe" as here and in all material respects the same as the Code section under consideration here. There was a reversal of the judgment of conviction for failure to corroborate the testimony of an accomplice. The court held that the giving or offer or promise of a bribe must be upon an understanding or agreement, but it definitely did not hold that an agreement or understanding upon the part of the witness or potential witness was necessary. It equated the language of the statute "upon any understanding or agreement" with the words "with the intent," as shown by the following excerpt from the opinion in *Kathan*:

> "The testimony of Heene, quoted above, as to Kathan's instructions when he gave him the money to pay Haibele, is the only direct evidence in the case upon that point. Kathan denies that he said anything of the kind of Heene. This raises the one vital point in the case. The corpus delicti, if a crime was committed, was not the paying of the money by Kathan, which is conceded, but the agreement or understanding under which it was given; the intent on the part of Kathan in making the payment through Heene to Haibele.

> "The section under which the defendant was convicted reads:

> "'A person who gives or offers or promises to give, to any witness or person about to be called as a witness, any bribe, upon any understanding or agreement that the testimony of such witness shall be thereby influenced, or who attempts by any other means fraudulently to induce any witness to give false testimony or to withhold true testimony is guilty of a felony.'"

> "The words 'upon any understanding or agreement,' and 'attempts * * * fraudulently to induce,' are tantamount to 'with the intent.'"

*Kathan* received consideration on the particular point in People v. Insogna, 28 A.D. 2d 771, 281 N.Y.S.2d 124 (1967) as follows:

"In People v. Kathan, 136 App.Div. 303, 307, 120 N.Y.S. 1096, 1099, an attorney was accused of bribing a key prosecution witness to withhold testimony against his client. There the attorney admitted payment but claimed it was paid as restitution in the pickpocketing case against his client. The court reversed the conviction and pointed out that the *corpus delicti* is not the payment of money, 'but the agreement or understanding under which it was given; the intent * * * in making the payment * * *' and held that the sufficiency of the evidence of corroboration is a question of law for the court."

■ Although other more persuasive considerations, as indicated herein, lead us to our construction of the statute involved, we note that the opinion in *Kathan* was rendered before the adoption of the Code of Alabama of 1923, in which the particular offense was first statutorily proscribed in Alabama, while the other cases considered from other jurisdictions were rendered subsequent to 1923. In mentioning this, we have in mind the principle of statutory construction that when a legislature enacts a statute borrowed from another jurisdiction, it is presumed that it is familiar with the construction placed on it in the other jurisdiction and that it adopted the statute as so construed. Eley v. Brunner-Lay Southern Corp., Inc., 289 Ala. 120, 266 So.2d 276, Ex parte Huguley Water System, 282 Ala. 633, 213 So.2d 799, Ex parte Thackston, 275 Ala. 424, 155 So.2d 526, Smith v. Flynn, 275 Ala. 392, 155 So.2d 497.

Fox v. Sheriff, Clark County, 86 Nev. 21, 467 P.2d 1022 (1970) is not conclusive as to this case, in the light of all the facts in that case, but as it is one of the most recent reported cases referring to several of the cases hereinabove discussed, it is cited and quoted from as follows:

"NRS 199.240 requires an agreement or understanding between the giver of the bribe and the receiver. If the giver makes an offer and he reasonably believes that the receiver has accepted, then there is an "understanding" between the parties. Ex parte Jang, 25 Cal.App.2d 529, 78 P.2d 250 (1938); People v. Schultz, 18 Cal.App.2d 485, 64 P.2d 440 (1937); People v. McAllister, 99 Cal.App. 37, 277 P. 1082 (1929); cf. State v. Ferraro, 67 Ariz. 397, 198 P.2d 120 (1948)."

In an effort to rationalize the view that a meeting of the minds of the parties is necessary for the commission of such a crime as here considered, some of the courts entertaining that view have concluded that a real meeting of the minds is not necessary, but that a feigned acceptance is sufficient. It seems to us that such an unwholesome result tends to vivify the unreasonableness of the view. It would mean that the Legislature intended to place a witness of probity in a position that he must either forthrightly reject the proposal, and thereby absolve the wrongdoer, or deal with him insincerely in order for the crime to be complete. However commendable under the circumstances the latter action would be considered by some, a witness should be free to decline to take it.

Each of the words of action in the statute (give, offer, promise) is basically unilateral. Each can be conditional or unconditional. If the Legislature had intended that a bilateral undertaking is essential, it could have reasonably provided that the essence of the crime be "entering into an agreement" with a witness to bribe him. The language of Section 76 does not require us to hold that whether the crime has been committed by one who has overtly done everything within his power to commit it is to be governed by what is done by

another at the time, or even many months or years thereafter.

■ What is meant by "upon any understanding or agreement that the testimony of such witness shall be thereby influenced" is that such is the condition upon which the offer, gift or promise is made. When definitely, positively, and overtly made on that condition, express or implied, the crime is committed. A rejection does not constitute an atonement; nor does it efface the fact that the criminal act was done.

■ Much evidence was admitted over objections of defendant of statements, out of the presence of defendant, of codefendants, who were indicted but not tried with the defendant-appellant. On appeal, as well as on the trial, defendant-appellant insists that such evidence was hearsay and therefore inadmissible. There was strong evidence of a conspiracy among the codefendants, and no error can be based upon the admission in evidence of the statements of the other defendants, in the light of the well established rule that statements of co-conspirators made during the progress of the conspiracy and in furtherance of its object are admissible against the defendant, even though made out of his presence and hearing. Edwards v. State, 279 Ala. 371, 185 So.2d 393; Poellnitz v. State, 48 Ala.App. 196, 263 So.2d 181; Hagood v. State, 47 Ala.App. 626, 259 So.2d 679. None of the testimony was as to statements of the other conspirators either before inception of the conspiracy or after its termination, and there was no fouling of any exception (such as found in Edwards v. State, supra) to the principle stated.

■ In addition to a plea of not guilty, defendant interposed a plea of entrapment. The evidence falls far short of sustaining such plea. The governing principles were recently stated in Johnson v. State, 291 Ala. 639, 285 So.2d 723, as follows:

"Entrapment occurs when State officers or persons under their control, incite, induce, lure, or instigate a person into committing a criminal offense, which that person would not have otherwise committed, and had no intention of committing. And when the general affirmative charge is requested based upon the defense of entrapment, the charge must be supported by uncontradicted evidence of unimpeachable weight and credibility, e. g., by the undisputed testimony of the State's own witnesses. Lindsay v. State, 41 Ala.App. 85, 125 So.2d 716 (1960). From the record we find no support for the general affirmative charge, hence it was not error to refuse to give it. There was contradiction in the evidence, and the defense of entrapment was a jury question. Demmon v. State, 46 Ala.App. 652, 248 So.2d 147 (1971)."

Evidence shows that the crime was conceived in the minds of the conspirators before any public officer, or anyone acting for any public officer, took any action whatever upon the subject. Such is the antithesis of entrapment.

■ Defendant took exception to the following portion of the court's charge relative to the conspiracy aspect of the case:

"So it is for you as a jury to determine, under the measure of proof as I have defined it to you, did a conspiracy exist? What there a meeting of the minds? Had the parties in question agreed? Was the defendant here one of those who agreed, either initially or at some time before the object was carried out?"

Appellant urges that "In this portion of the charge the Court has determined that the objective of the conspiracy was carried out and this is what the jury heard."

The portion of the charge is not subject to the criticism noted. The trial court did not state that the objective was or had been carried out. From the text and the context, it is clear that the trial court was limiting the time requirement for consideration of whether there was a conspiracy and its consequences between its inception and its consummation, as to which there could have been no error prejudicial to appellant.

The citation of cases such as Cleaver v. United States, 238 F.2d 766 (10 Cir. 1956) is of no avail to appellant. He relies upon them in connection with his contention that Deputy Looney's testimony before the grand jury on September 9, 1969, "concluded the conspiracy, if one ever existed." Even if such contention, with which neither *Cleaver* nor we are in accord, were correct, as already noted herein there was no testimony as to what any conspirator other than defendant said after September 9, 1969, the day upon which Officer Looney testified before the grand jury.

▮ That the bribe money was delivered by defendant the day after Officer Looney had testified does not militate against the conclusion herein reached. As to this we agree with People v. McAllister, 99 Cal. App. 37, 277 P. 1082 (1929) in which it was said:

"The term 'or person about to be called as a witness' in the first part of the section, it seems clear, was used with the legislative intent of including within its denouncement all offers of bribes to any person in contemplation of his becoming a witness. Such anticipation is not affected as to its moral or legal wrongfulness by the fact, if it be one, that the proceeding in which influenced testimony is to be given or withheld has not yet been filed. It seems equally clear that the term 'any person' used in the last phrase is intended to include both any witness and any person about to be called as a witness as denominated in the first part of the statute. If A attempts by any means other than bribery to induce B to give false or withhold true testimony, the criminal act is committed, and the criminal intent exists equally whether there is or is not a proceeding then pending, during the progress of which B is to give testimony or withhold it."

and with what was held in Wilson v. United States, 77 F.2d 236 (8 Cir. 1935), cert. denied 295 U.S. 759, 55 S.Ct. 926, 79 L.Ed. 1701, in dealing with the question of whether a bribery statute was applicable to a witness before a grand jury, in which it was stated:

"The purpose and policy of the enactment here involved is obvious. It is to prevent miscarriages of justice through the accepting of bribes by material witnesses for the suppression or the changing of their evidence, in cases, hearings, and proceedings in the courts of the United States, as well as before committing magistrates and other officers authorized to hear evidence and take testimony. There is every reason why the courts should not unduly limit or restrict the language of the statute."

Accepting the evidence as true, which the jury had a right to do, defendant through others was a party to offers and promises to bribe the witness before he testified before the grand jury. Moreover, that he had testified once did not preclude his testifying again.

▮ That defendants did not directly contact Officer Looney did not prevent a consummation of the crime. As stated in 12 Am.Jur.2d Bribery, § 9:

"A bribe may be consummated without any personal dealings between the offeror of the bribe and the one to whom the offer is made. The entire transaction may be handled by an intermediary acting for one or the other of the parties."

citing Commonwealth v. Connolly, 308 Mass. 481, 33 N.E.2d 303; State v. Whetstone, 30 Wash.2d 301, 191 P.2d 818, cert. den. 335 U.S. 858, 69 S.Ct. 131, 93 L.Ed. 405.

The testimony in this case amply supports the verdict of the jury and the action of the trial court in overruling defendant's motion for a new trial. We have considered the entire record as provided by Title 15, § 389, Code of Alabama 1940, and conclude that there is no prejudicial error therein and that the judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Hon. LEIGH M. CLARK, Supernumerary Circuit Judge, serving as a judge of this Court under § 2 of Act No. 288, July 7, 1945, as amended; his opinion is hereby adopted as that of the Court.

The judgment below is hereby

Affirmed.

ALMON, TYSON and HARRIS, JJ., concur.